588 A.2d 786

Norman A. ODYNIEC, et al.

v.

Roger E. SCHNEIDER.

No. 37, Sept. Term, 1990.

Court of Appeals of Maryland.

April 15, 1991.

Marvin Ellin and David Agatstein (Ellin & Baker, on brief), Baltimore, for appellants.

E. Dale Adkins, III (Constance D. Burton, Anderson, Coe & King, on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE and CHASANOW, JJ.

MURPHY, Chief Judge.

This case concerns the scope of the privilege in a defamation action as it applies to a physician retained as an expert witness in a health claims arbitration proceeding under Maryland Code (1989), §§ 3–2A–01 through 3–2A–09 of the Courts and Judicial Proceedings Article.[1]

---

1. These statutory provisions require that certain medical malpractice claims be submitted to an arbitration panel for initial ascertainment of liability and damages before resort may be had to a court of law for final determination. *See Jewell v. Malamet,* 322 Md. 262, 587 A.2d 474 (1991); *Oxtoby v. McGowan,* 294 Md. 83, 86, 447 A.2d 860 (1982).

## I.

Norman A. Odyniec, M.D. and Mitchell Mills, M.D. (the plaintiffs) filed a complaint against Roger E. Schneider, M.D. in the Circuit Court for Baltimore County seeking compensatory and punitive damages for defamation. The complaint averred that on August 13, 1986, Virginia R. Ensor underwent arthroscopic surgery on her right knee, a procedure which involved shaving or removing torn cartilage in the knee joint; that during the surgery, the orthopedic surgeon negligently lacerated the popliteal artery in her right knee; that when Ms. Ensor was discharged from the hospital on September 4, 1986, she was not diagnosed as having a severed popliteal artery, but rather with a diagnosis of venous thrombosis; and that it was not until October 21, 1986 that the orthopedist who lacerated the popliteal artery found, through the performance of magnetic resonance imaging (MRI), that she was suffering from a false aneurism and/or bleeding into the knee joint from the popliteal artery.

The complaint further alleged that Ms. Ensor lost confidence in the orthopedic surgeon and sought the surgical advice and treatment of the plaintiffs; that Dr. Odyniec subsequently performed corrective vascular surgery at Sibley Memorial Hospital on Ms. Ensor's right leg; and that although he was unable to reunite the severed ends of the popliteal artery, he ligated the ends of the transected artery and determined that the patient would need to rely on collateral blood supply to the lower leg. Further in the complaint, it was alleged that on June 9, 1987, Ms. Ensor filed a medical malpractice claim with the Health Claims Arbitration Office against the orthopedist who lacerated her popliteal artery, a consulting vascular surgeon who failed to diagnose the laceration, the radiologist who diagnosed venous thrombosis, and the hospital; that pursuant to Maryland Rule 2-423, Ms. Ensor was required to submit to a physical examination by an expert of the defendants' choice; and that to this end the defendants retained Dr. Schneider as an expert in defense of the suit.

According to the plaintiffs' complaint, the extent of Dr. Schneider's services was "to elicit a history, examine the patient, review records furnished him by the referring attorney ... and state an opinion as to whether malpractice had occurred on the part of the vascular surgeon named in the malpractice suit and an opinion as to the present status of [Ms.] Ensor's condition and its relationship if any to the contended malpractice of the Defendants" against whom the suit was brought. It was further averred in the complaint that after a cursory examination of Ms. Ensor, and without the benefit of any arteriographic studies, Dr. Schneider said to her:

"You have been lied to by your surgeons [the plaintiffs] at Sibley Hospital. Your popliteal artery was never ligated. They have not told you the truth. There is nothing wrong with your artery. You are perfectly all right. It is just that you have been given false information. You could not possibly have a ligated artery."

The complaint then alleged that after Dr. Schneider's statement, Ms. Ensor believed that she had undergone unnecessary surgery and that the plaintiff doctors had been guilty of fraud in their treatment and contact with her. According to other averments in the complaint, Ms. Ensor believed that she had undergone surgery for a condition other than that related to her and that her disability arose from an injury inflicted by the plaintiff Doctors Odyniec and Mills instead of through the laceration of her popliteal artery by the orthopedist on August 13, 1986. The complaint further specified that after Ms. Ensor was advised that the plaintiffs had ligated her popliteal artery, and that an arteriograph would confirm this fact, she underwent such a test which confirmed the advice given to her by the plaintiffs.

Dr. Schneider moved to dismiss the complaint pursuant to Maryland Rule 2–322 on the ground that it failed to state a claim upon which relief could be granted; he contended that the allegedly defamatory comments were made during the course of a judicial proceeding and were therefore absolutely privileged. The Circuit Court for Baltimore County

(Buchanan, J.) granted the motion to dismiss. Relying upon *Adams v. Peck,* 288 Md. 1, 415 A.2d 292 (1980), the court concluded that Dr. Schneider's verbal statements to Ms. Ensor were absolutely privileged. We granted certiorari prior to consideration of the appeal by the Court of Special Appeals to consider the significant issue of public importance raised in the case.

## II.

Upon an appeal from the granting of a Rule 2–322 motion to dismiss a complaint, the truth of all well-pleaded relevant and material facts is assumed, as well as all inferences which can be reasonably drawn from the pleadings. *See Figueiredo–Torres v. Nickel,* 321 Md. 642, 647, 584 A.2d 69 (1991); *Sharrow v. State Farm Mutual,* 306 Md. 754, 768–69, 511 A.2d 492 (1986).

As appellants, Doctors Odyniec and Mills contend that the trial court erred in treating Dr. Schneider's verbal statements to Ms. Ensor as having been made in the course of judicial proceedings. They claim that, at the time the defamatory statements were made, Dr. Schneider was neither required nor requested to say anything to Ms. Ensor; that he was employed to render an opinion as to whether physicians were negligent in treating Ms. Ensor; and that he was only to examine Ms. Ensor and report his medical findings to the lawyer who engaged his services, and not to Ms. Ensor. Therefore, appellants contend Dr. Schneider's statements were totally gratuitous, were unsolicited, and ascribed outrageous and fraudulent conduct to them in their professional practice. They urge that Dr. Schneider's unsolicited statements were neither published to the attorney who had retained him, nor were they even remotely intended to be used as evidence in any judicial proceeding.

Furthermore, appellants argue that Dr. Schneider's statements were uttered at a time when the Health Claims Arbitration Office was not exercising any judicial or quasi-judicial functions, and that the statements far exceeded Dr.

Schneider's potential function as an expert witness before an arbitration panel. As to this, the appellants maintain that investigatory work performed by an expert witness is not, in itself, the exercise of a judicial or quasi-judicial function and, therefore, statements by an expert in such circumstances are not accorded absolute privilege simply because they were addressed to a party in the arbitration proceedings.

The appellants recognize that the absolute privilege granted to witnesses in judicial proceedings is necessary to the proper administration of justice and is in furtherance of the public policy of the State. They emphasize, however, that because Dr. Schneider's defamatory statements were made at a time when no judicial safeguards were present, and were wholly unrelated to any judicial proceeding, it would undermine the public policy of promoting the proper administration of justice if these statements were accorded an absolute privilege.

Finally, appellants contend that the so-called judicial privilege is not applicable in a health claims arbitration proceeding. These proceedings, they say, are not judicial proceedings since the arbitration panel's decisions are not binding and the panel does not exercise any judicial power. In any event, the appellants point out that Dr. Schneider's defamatory statements were not made before the panel, but were uttered in a setting lacking all attributes of an adversary proceeding, namely, during Dr. Schneider's medical examination of Ms. Ensor.

### III.

Statements made during the course of judicial proceedings (with an exception for lawyers in some circumstances) are absolutely privileged, and therefore cannot serve as the basis for an action sounding in defamation. *Miner v. Novotny*, 304 Md. 164, 170, 498 A.2d 269 (1985); *Keys v. Chrysler Credit Corp.*, 303 Md. 397, 403–04, 494 A.2d 200 (1985); *Adams v. Peck*, 288 Md. 1, 3, 415 A.2d 292

(1980); *Kennedy v. Cannon,* 229 Md. 92, 97, 182 A.2d 54 (1962). "This absolute privilege protects the person publishing the defamatory statement from liability even if his purpose or motive was malicious, he knew that the statement was false, or his conduct was otherwise unreasonable." *Adams,* 288 Md. at 3, 415 A.2d 292. As Maryland has long adhered to the so-called "English" rule of privilege for witnesses' statements, the privilege is absolute without regard to the relevancy of the defamatory statement to the subject matter of the proceedings. *Keys,* 303 Md. at 404, 494 A.2d 200; *Korb v. Kowaleviocz,* 285 Md. 699, 704, 402 A.2d 897 (1979). Absolute privilege extends not only to statements made in court, but also to statements contained in pleadings, affidavits and other documents filed in a judicial proceeding or directly related to the case. *DiBlasio v. Kolodner,* 233 Md. 512, 520–23, 197 A.2d 245 (1963); *Kennedy,* 229 Md. at 97, 182 A.2d 54; *Bartlett v. Christhilf,* 69 Md. 219, 226, 14 A. 518 (1888). Defamatory statements published in documents prepared for use in connection with a pending judicial proceeding are also privileged, even if they have not yet been filed. *Keys,* 303 Md. at 404, 494 A.2d 200; *Adams,* 288 Md. at 4, 415 A.2d 292. As Judge Davidson said for the Court in *Adams,* 288 Md. at 8, 415 A.2d 292:

> "The evaluation and investigation of facts and opinions for the purpose of determining what, if anything, is to be raised or used in pending litigation is as integral a part of the search for truth and therefore of the judicial process as is the presentation of such facts and opinions during the course of the trial, either in filed documents or in the courtroom itself. Such evaluation and investigation, and the documents which these activities generate, are directly related to the pending litigation and occur during the course of the judicial proceeding. The people who engage in these activities and who generate such documents must be able to do so without being hampered by the fear of private suits for defamation. Accordingly, any defamatory statement which appears in a document prepared

for possible use in connection with a pending judicial proceeding should be accorded an absolute privilege, regardless of whether the document has been filed."

The absolute privilege is based upon sound considerations of public policy, it being of the greatest importance to the administration of justice that witnesses should testify with their minds absolutely free from apprehension that they may subject themselves to an action of slander for what they say while giving their testimony. *Miner*, 304 Md. at 171, 498 A.2d 269; *Adams*, 288 Md. at 5, 415 A.2d 292; *Hunckel v. Voneiff*, 69 Md. 179, 187–88, 14 A. 500 (1888). Because the need for participants to speak freely during judicial proceedings is so essential to the judicial process, the individual's right to redress for defamation is necessarily curtailed. *McDermott v. Hughley*, 317 Md. 12, 23–24, 561 A.2d 1038 (1989); *Gersh v. Ambrose*, 291 Md. 188, 191–92, 434 A.2d 547 (1981).

## IV.

We first considered the application of the principles underlying the absolute privilege to a witness speaking before a nonjudicial body in *Gersh v. Ambrose, supra.* In that case, a staff member of the Baltimore City Community Relations Commission filed a defamation suit against an Assistant State's Attorney, alleging that he made slanderous statements at a public hearing before that body. We observed that most jurisdictions extend absolute immunity to witnesses testifying in other than strictly, in-court settings only after ascertaining that the forum offers "sufficient judicial safeguards so as to minimize the likelihood of harm to potentially defamed (or otherwise injured) individuals who would have no legal remedy." *Id.* at 192, 434 A.2d 547. By way of example, we cited *Butz v. Economou*, 438 U.S. 478, 513, 98 S.Ct. 2894, 2914, 57 L.Ed.2d 895 (1978), wherein the Supreme Court extended absolute immunity to adjudication before a federal administrative agency because it "shares enough of the characteristics of the judicial process that those who participate in such adjudication

should also be immune from suits for damages." We noted that most state jurisdictions which have extended absolute privilege principles to complainants and witnesses before administrative bodies have characterized the proceedings as "quasi-judicial." We said that "the nature and scope of such proceedings are too varied to be circumscribed by specific criteria." *Id.* at 197, 434 A.2d 547. We decided that

> "whether absolute witness immunity will be extended to any administrative proceeding will have to be decided on a case-by-case basis and will in large part turn on two factors: (1) the nature of the public function of the proceeding and (2) the adequacy of procedural safeguards which will minimize the occurrence of defamatory statements."

There being no evidence of the kind of safeguards which are present during judicial proceedings, and no evidence that the hearing was anything other than an open public hearing, we declined to extend absolute immunity to the witness in the *Gersh* case. We concluded that the public benefit which might be derived from unfettered testimony at that type of hearing was "not sufficiently compelling to outweigh the possible damage to individual reputations to warrant absolute witness immunity." *Id.* at 196, 434 A.2d 547.

*Miner v. Novotny, supra* involved a citizen's brutality complaint filed against a deputy sheriff, as authorized by the Law Enforcement Officers' Bill of Rights (LEOBR), Code (1987 Repl.Vol.), Art. 27, §§ 727–734D. The complaint triggered an administrative disciplinary proceeding against the deputy sheriff who, after he was found not guilty of any misconduct, filed a defamation suit against the complaining citizen. After reviewing the nature and scope of the administrative proceeding, we held that the citizen's defamatory statements were "protected by the same absolute privilege as are statements made by witnesses in judicial proceedings." *Id.,* 304 Md. at 177, 498 A.2d 269. In so concluding, we examined the safeguards present during

the investigation of the complaint, and at the adjudicatory hearing before the departmental hearing board, noting that they were adequate to minimize the occurrence of defamatory statements. We observed that under the statute, complaints of brutality are not investigated unless they are sworn, and that false complaints are subject to criminal liability; that prior to investigation, the officer has a right to be informed in writing of the nature of the investigation and of the officers involved in it; that the officer has a right to counsel during interrogation and to a record of the interrogation; that if an adversarial hearing is warranted after the investigation, it is held before at least three officers who were not involved in the investigation; that the officer has a right to counsel at the hearing; that the hearing board is authorized to issue summonses for witness. and documents; and witnesses at the hearing testify under oath and are subject to cross-examination.

In light of the extensive safeguards mandated by statute, and the important public function of the administrative disciplinary procedures, we expressed concern that a citizen complaint might be deterred absent absolute privilege. *Id.* at 176, 498 A.2d 269. We said "that the possible harm a false brutality complaint may cause to a law-enforcement officer's reputation, despite the procedural safeguards provided by the LEOBR, is outweighed by the public's interest in encouraging the filing and investigation of valid complaints." *Id.*

We again addressed the extension of absolute privilege to the nonjudicial sphere in *McDermott v. Hughley,* 317 Md. 12, 561 A.2d 1038 (1989). The question there presented was whether the reports of a psychologist, requested by an employer and bearing on the fitness of an employee for employment, enjoyed the defense of absolute privilege in a defamation action filed by the employee. We rejected the psychologist's argument that his report was absolutely privileged as having been made in connection with an on-going administrative proceeding. We found that there was no legally cognizable tribunal administering the proceeding;

rather, there was a meeting between the psychologist, the employer, and the employee, which was in the nature of a status conference designed to assess the psychologist's progress in diagnosing the employee's problem. *Id.* at 26, 561 A.2d 1038. We noted that there were insufficient procedural safeguards present; that "there was no public hearing adversary in nature; no compellable witnesses were sworn or cross-examined; no reviewable opinion or analysis was generated; and ... [the employee had no] opportunity to present his side of the story." *Id.* We found that the employee had not sufficiently demonstrated that the proceedings served a public function or that any official investigation was ever instituted. We concluded that the "administrative investigation" did not rise to the minimum level necessary to constitute the adequate procedural safeguards as outlined in *Gersh. Id.*

*Gersh, Miner,* and *McDermott* thus stand for the proposition that absolute witness immunity will not be extended to a nonjudicial proceeding unless the same policy considerations which underlie the application of the privilege in the judicial sphere are also present. It must appear from the nature and conduct of the proceeding that society's benefit from unfettered speech during the proceeding is greater than the interests of an individual who might be defamed during that proceeding.

## V.

As earlier observed, Dr. Schneider was employed to examine Ms. Ensor and make a report in connection with a pending arbitration proceeding before the Health Claims Arbitration Office. Dr. Schneider's defamatory statement, according to the complaint, occurred when he told Ms. Ensor, after a cursory examination, that her artery had not been ligated and that appellants had lied when they told her that it had been ligated.

Subtitle 2A of Title 3 of the Courts Article, entitled "Health Care Malpractice Claims," contains ten sections

which govern the filing and disposition of claims before the Health Claims Arbitration Office for damages against designated health care providers for negligently rendering or failing to render health care services. The Office is a unit of the Executive Branch of government and is headed by a Director appointed by the Governor. § 3–2A–03. Under various of its provisions, the statute requires that the Director refer all issues of liability and damages to a three-member arbitration panel chosen at random from lists of qualified persons; the panels are comprised of an attorney, a health care provider, and a member of the general public. The arbitration panel is chaired by the attorney who decides all prehearing issues, including those relating to discovery and motions in limine. § 3–2A–05(c). The arbitration panel determines whether the health care provider is liable to the claimant and, if so, the extent of the damages. § 3–2A–05. *See, e.g., Jewell v. Malamet, supra* (n. 1); *Attorney General v. Johnson,* 282 Md. 274, 285, 385 A.2d 57, *appeal dismissed,* 439 U.S. 805, 99 S.Ct. 60, 58 L.Ed.2d 97 (1978).

Section 3–2A–02(c) provides that, unless otherwise provided, the Maryland Rules of Procedure shall govern all practice and procedure issues arising under the statute. Thus, the physical examination of a party to a health claims arbitration formally is governed by Maryland Rule 2–423, so that the "manner, conditions, and scope of the examination and the person or persons by whom it is to be made" ultimately are under the control of the attorney who chairs the panel.

Moreover, § 3–2A–03(b)(3) empowers the Director to "adopt reasonable rules and regulations to govern procedures under this subtitle," and the Director has so acted by adopting an extensive body of procedural rules. *See* CO-MAR, Title .01, Subtitle .03.

The provisions of both the statute and the rules are detailed and comprehensive. When a claim is filed with the Director, a copy is served upon the health care provider who, in turn, files a response with the Director and with the

claimant, pursuant to the same procedure provided in the Maryland Rules for filing a responsive pleading to a complaint. § 3–2A–04. Thereafter, the Director forwards the names of arbiters to the parties, together with a brief biographical sketch as to each. Before delivering the list, the Director must inquire of the persons selected, and assure himself, "that they do not have a personal or economic relationship with any of the parties or their counsel, or any cases in which they are a party before the arbitration office, that can form the basis of partiality on their part." § 3–2A–04(c)(2). A party has a right to object to any arbiter on the list by stating the reasons for the objection in writing. The arbiter shall be replaced if the Director finds a reasonable basis for the objection. § 3–2A–04(d).

The Act requires a claimant at the commencement of the action to file a certificate prepared by a qualified expert stating that the practitioner departed from the standard of care and that such departure was the proximate cause of the injury. A copy of this certificate is then served on all parties to the claim. Discovery is available as to the basis of the certificate. § 3–2A–04(b)(1), (3).

The statute and its accompanying rules contain many of the characteristics of a judicial proceeding. The parties may be represented by counsel. The proceedings before the arbitration panel are public and are adversarial in nature. Witnesses are subject to subpoena, sworn, and subject to cross-examination. The panel may rule on matters of evidence. It may regulate the course of the proceedings. Panel members are immune from liability for the panel's decision and are insulated from political influence. Prehearing discovery is available. Each party may present a case by oral or documentary evidence, and the arbitration panel must make its determination in writing.

In *Attorney General v. Johnson, supra,* 282 Md. at 285, 385 A.2d 57, we said that a health claims arbitration panel is neither an administrative agency nor a judicial body in the traditional sense. *See also Oxtoby v. McGowan,* 294 Md. 83, 91, 447 A.2d 860 (1982). The practice and procedure,

pursuant to which the Health Claims Arbitration Office and its arbitration panels operate, however, is at least as functionally comparable to a trial before a court as the administrative disciplinary proceedings involved in *Miner v. Novotny, supra.* We think that the arbitration machinery established by the legislature for health care malpractice cases falls well within the principle, as first articulated in *Gersh v. Ambrose, supra,* that in appropriate cases, an absolute privilege in defamation actions will be extended beyond the confines of purely judicial proceedings. Taking full account of the vital public function of health care malpractice proceedings initiated before arbitration panels, and of the procedural safeguards provided by the statute and the implementing rules to minimize the occurrence of defamatory statements, we conclude that the absolute privilege may safely be extended to statements of potential witnesses made during the pendency of such proceedings. In this regard, we reiterate that "[t]he investigation, evaluation, presentation and determination of facts are inherent and essential parts of this process." *See Adams v. Peck, supra,* 288 Md. at 5, 415 A.2d 292.

 That Dr. Schneider's defamatory statement may have been gratuitous, unsolicited, and in part irrelevant to the purpose for which he was employed, and was not made during the actual hearing before the arbitration panel, does not defeat the absolute privilege. Whatever Dr. Schneider's motivation may have been, he made his verbal statement to Ms. Ensor, a party in the then-pending arbitration proceeding, while he was conducting a medical examination of her in preparation for his participation in that proceeding. It was thus made in the course of his participation in that pending proceeding and therefore, without regard to its relevance, the verbal statement is accorded the same absolute privilege as if it had been made by a witness during the arbitration hearing itself.

The social benefit derived from free and candid participation by potential witnesses in the arbitration process is essential to achieve the goal of a fair and just resolution of

claims of malpractice against health care providers. At the same time, we are mindful of the damage that may be done to a health practitioner's reputation by a defamatory statement. But balancing the potential harm caused by such statement made during the pendency of the arbitration process against the societal value of maintaining the integrity of the process itself, we accord greater weight to the latter. The strong public policy considerations which led us to accord an absolute privilege in *Adams* and *Miner* are equally present in the circumstances of the present case.

Accordingly, we hold that the motion to dismiss was properly granted because, accepting all factual averments of the complaint as true, it failed to state a cause of action upon which relief could be granted.

JUDGMENT AFFIRMED, WITH COSTS.