648 A.2d 1074

**Carmen M. ARROYO**

v.

**Gerald M. ROSEN.**

**No. 172, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Oct. 27, 1994.

F. Todd Taylor, Jr. (Barry Silber, on the brief), Columbia, for appellant.

Howard J. Schulman, Baltimore, for appellee.

Argued before WILNER, C.J., MOYLAN, J., and JAMES S. GETTY, Judge (retired), Specially Assigned.

WILNER, Chief Judge.

On July 16, 1991, appellee, Gerald M. Rosen, Ph.D., filed suit in the Circuit Court for Baltimore County against appellant, Carmen M. Arroyo, Ph.D., and against Dr. Arroyo's husband, The Baltimore *Sun*, and Patricia Meisol, a reporter for the *Sun*. At trial, Dr. Rosen dismissed the claims relating to Meisol and The Baltimore *Sun*. Nine claims of defamation, one of invasion of privacy, and one of conversion against Dr. Arroyo, as well as three claims of civil conspiracy against Dr. Arroyo's husband (conspiracy with Dr. Arroyo to defame, to convert, and to invade privacy) were submitted to the jury. The jury returned a verdict in favor of Dr. Rosen on all but the civil conspiracy claims. The jury awarded a total of $75,001 damages: $20,000 for defamation, $30,000 for invasion

of privacy, one dollar for conversion,[1] and $25,000 in punitive damages. Dr. Arroyo filed this appeal, in which she presents the following questions:

"1. Did the court err when it refused to recognize the appellant's absolute privilege to bring her allegations of scientific misconduct before the investigative committees of the University of Maryland and Veterans' Administration?

2. Did the court err by not instructing the jury on the existence of the appellant's conditional privilege?

3. Was there sufficient evidence of constitutional malice to overcome the appellant's conditional privilege?

4. Did the mailing of a committee's report to a colleague, upon request, constitute an invasion of appellee's privacy?"

We find no error and shall affirm the decision of the circuit court.

■ Much of the factual background of this case is in dispute. Because the jury returned a verdict in favor of Dr. Rosen, we review disputed facts in the light most favorable to him. *See Greenbelt Cooperative Publishing Ass'n v. Bressler,* 253 Md. 324, 328, 252 A.2d 755 (1969), *rev'd on other grounds,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970).

Dr. Rosen, Chairman of the Department of Pharmacology and Toxicology at the School of Pharmacy of the University of Maryland at Baltimore, hired Dr. Arroyo as a post-doctoral fellow in February, 1989. She was later appointed to the position of Research Associate. The primary research interest of both Dr. Rosen and Dr. Arroyo was the role of free radicals in biological systems.[2]

---

**1.** The conversion claim, which is not at issue in this appeal, arose from incidents in August, 1990. The facts were disputed, but the jury could have found that during that month Dr. Arroyo took from Dr. Rosen's office binders containing results of experiments by Dr. Rosen, a galley proof of an article by Dr. Rosen, and a copy of a grant application.

**2.** A free radical is a molecule with an unpaired electron. The presence of the unpaired electron makes the molecule highly reactive; it is therefore capable of starting a chain reaction among nearby molecules.

In September, 1989, Dr. Arroyo submitted to a scientific journal a paper on the "spin trapping" of the free radical of nitric oxide. Dr. Arroyo was listed as principal author, with Dr. Rosen and another colleague listed as co-authors. In November, 1989, Dr. Arroyo told Dr. Rosen that the referees for the journal had made suggestions for further work. Dr. Rosen asked to see the referees' comments. Without showing Dr. Rosen the comments, and without his approval, Dr. Arroyo submitted a revised version of the article to the journal. She showed Dr. Rosen the revised version in February, 1990, informing him then that it had been accepted for publication. Dr. Rosen told her that he did not believe that her data supported her conclusions and advised her to withdraw the paper. Dr. Arroyo appealed the matter to the dean of the School of Pharmacy. The dean referred the paper to the university for outside review; based on the reviewer's critique, the university agreed with Dr. Rosen that the paper should be withdrawn.

This apparently led to some ill feeling between Drs. Arroyo and Rosen. In March, 1990, the dean transferred Dr. Arroyo to the supervision of the Head of the Division of Pulmonary Medicine. On November 7, 1990, citing "offensive personal interactions," the dean directed Dr. Arroyo to quit her work space in Pharmacy Hall, while allowing her to continue the use of the laboratory in that building.

In June, 1990, Dr. Arroyo filed a complaint with the Office of Scientific Integrity of the U.S. Department of Health and Human Services, alleging scientific misconduct on the part of Dr. Rosen. Either later that month or sometime the following month, she sent a letter to forty-three colleagues, who constituted a substantial proportion of the scientists in the United States specializing in Dr. Rosen's and Dr. Arroyo's field. In the letter, she accused Dr. Rosen, among other things, of using plagiarized material, poor management, carelessness, bad judgment, and "improper distribution of credit."

---

Although free radicals are essential to life, an excess of them may be harmful to living organisms.

During 1989 and the first part of 1990, Dr. Arroyo had been attempting to reproduce one of Dr. Rosen's experiments. Because she was unable to produce results consistent with his data, she became suspicious that he had not performed the experiment and was improperly reusing data from earlier experiments. In July, 1990, she received an anonymous letter. The author of the letter was later identified as Dr. Ronald Mason of the National Institutes of Health, one of the forty-three recipients of her letter. In the letter, Dr. Mason voiced suspicions that Dr. Rosen had fabricated data and suggested that Dr. Arroyo look through his published papers for duplicated data. Dr. Arroyo did so and found several instances of what appeared to her to be data taken from earlier experiments and improperly described as new data.

When the university administration learned of her complaint to the Office of Scientific Integrity and her subsequent letter, Dr. Arroyo was advised to pursue the matter through university grievance procedures. She did so, and the university established a Committee of Inquiry on the matter. On September 4, 1990, she submitted a memo to the Committee repeating her earlier charges and also charging duplication of data. On September 12, 1990, she wrote to the Committee, repeating and elaborating on most of the charges and adding charges that Dr. Rosen "claims to be expert in areas that he has had neither real training nor has that [sic] facilities to do the work; claims that he was going to acquire facilities but never did." The committee found that most of Dr. Arroyo's charges were without support. It did, however, conclude that her charges of misconduct with reference to the duplication of figures in four pairs of published articles were substantiated. The committee recommended a formal investigation of Dr. Rosen's handling of data in those papers. A Committee of Investigation conducted such an investigation. Dr. Arroyo repeated her charges in testimony before the committee. The committee's report cleared Dr. Rosen. An investigation by the Veterans' Administration, which had funded Dr. Arroyo's position, also exonerated Dr. Rosen of all of Dr. Arroyo's charges, although it found two instances where Dr. Rosen had

taken insufficient care in presenting his data, and suggested that he be more careful in the future.

At a scientific meeting on May 14, 1991, the day after the University Committee of Investigation issued its report exonerating Dr. Rosen, Dr. Arroyo told Dr. Gregory B. Bulkley of the Johns Hopkins Hospital about her suspicions of Dr. Rosen. Dr. Bulkley asked to see some evidence, and Dr. Arroyo then faxed him the first page of the report of the University Committee of Inquiry, which included the committee's finding that "[t]he charge against Dr. Rosen of fabrication and deceptive selection of data in peer-reviewed and invited publications was substantiated by the Committee's review".

The Baltimore *Sun* published articles about the dispute written by Patricia Meisol on July 25, 1991 and on February 24, 1992. Dr. Arroyo's employment with the University of Maryland was eventually terminated.

## DISCUSSION

### Absolute privilege

■ Dr. Arroyo argues first that the statements she made about Dr. Rosen's scientific practices to the investigatory committees of the University of Maryland and Veterans' Administration were absolutely privileged—that they have equivalent status with statements made in the course of judicial proceedings. Accordingly, she contends that "the person publishing the defamatory statement [should be protected] from liability even if his purpose or motive was malicious, he knew that the statement was false, or his conduct was otherwise unreasonable." *Odyniec v. Schneider*, 322 Md. 520, 527, 588 A.2d 786 (1991) (quoting *Adams v. Peck*, 288 Md. 1, 3, 415 A.2d 292 (1980)). The Court of Appeals has explained the underlying rationale for according such a privilege to participants in judicial proceedings as follows:

> "[S]uch a privilege is necessary to the proper administration of justice. The ultimate purpose of the judicial process is to determine the truth. The investigation, evaluation, presentation, and determination of facts are inherent and essential

parts of this process. If this process is to function effectively, those who participate must be able to do so without being hampered by the fear of private suits for defamation." *Adams v. Peck,* 288 Md. at 5, 415 A.2d 292.

The Court of Appeals has twice extended that absolute privilege to testimony and complaints before administrative bodies. In *Miner v. Novotny,* 304 Md. 164, 498 A.2d 269 (1985), the Court held "that a citizen's brutality complaint filed against a law-enforcement officer is protected by the same absolute privilege as are statements made by witnesses in judicial proceedings, and that such complaints cannot, therefore, serve as a basis for a defamation suit." *Id.* at 177, 498 A.2d 269. In *Odyniec v. Schneider, supra,* the Court held that "the absolute privilege may safely be extended to statements of potential witnesses made during the pendency of [Health Claims Arbitration Office] proceedings." 322 Md. at 534, 588 A.2d 786. Dr. Arroyo argues that an extension of the absolute privilege to testimony before bodies investigating allegations of scientific misconduct is supported by strong policy reasons, including the interest of society in the soundness of research that forms the basis of the formulation of medicine, treatment procedures, and recognition of diseases.

It is worth noting that, despite the societal interest in safe medical practice, the Legislature has seen fit to extend to persons giving information to medical review committees only the equivalent of a qualified privilege. (*See* Md.Code, Cts. & Jud.Proc. art. § 5–393: "A person who acts *in good faith* and within the scope of the jurisdiction of a medical review committee is not civilly liable ... for giving information to ... the medical review committee" (emphasis added); *see also* Md. Code Health Occ. art. § 14–501(b).) Even if we were to assume that "the same policy considerations which underlie the application of the privilege in the judicial sphere," *Odyniec,* 322 Md. at 531, 588 A.2d 786, are present here, policy considerations alone are not enough to support an extension of the privilege. The other factor considered by the Court of Appeals in both *Miner* and *Odyniec,* as well as in cases where extension of the privilege was rejected, was whether "the

forum offers 'sufficient judicial safeguards so as to minimize the likelihood of harm to potentially defamed ... individuals.' " *Odyniec,* 322 Md. at 528, 588 A.2d 786 (quoting *Gersh v. Ambrose,* 291 Md. 188, 192, 434 A.2d 547 (1981)). *See also Miner v. Novotny, supra,* 304 Md. at 174, 498 A.2d 269; *McDermott v. Hughley,* 317 Md. 12, 26, 561 A.2d 1038 (1989).

The forum in *Odyniec* was a proceeding before the Health Claims Arbitration Office governed by Md.Code, Cts. & Jud. Proc. art. § 3–2A–04. The *Odyniec* Court described the safeguards mandated there as follows:

> "The parties may be represented by counsel. The proceedings ... are public.... Witnesses are subject to subpoena, sworn, and subject to cross-examination.... Prehearing discovery is available. Each party may present a case by oral or documentary evidence, and the arbitration panel must make its determination in writing."

*Odyniec,* 322 Md. at 533, 588 A.2d 786. The forum in *Miner v. Novotny, supra,* was an administrative proceeding under the "Law–Enforcement Officers' Bill of Rights," Md.Code art. 27 §§ 727–734D. The *Miner* court outlined the safeguards in force there:

> "[N]o brutality complaint may be investigated ... unless the complaint is duly sworn to.... A person who knowingly makes a false complaint is subject to criminal liability.... [A] complete record of the investigation must be kept, and must be made available to the officer upon request at the completion of the investigation, and at least ten days before any hearing....
>
> . . . . .
>
> The hearing phase of the proceeding is adversarial in nature.
>
> . . . . .
>
> Each party may request that the hearing board issue summonses compelling the attendance and testimony of witnesses, and the production of documents.... The hearing board's summons may be enforced, in the proper circum-

stances, by an order of the circuit court.... Witnesses must testify under oath.... Each party has the right to cross-examine witnesses, and to submit rebuttal evidence."

*Miner*, 304 Md. at 174–75, 498 A.2d 269 (citations omitted). Administrative hearings in contested cases in State agencies generally are governed by subtitle 2 of the Administrative Procedure Act, Md.Code State Gov't art. §§ 10–201 to 10–226. In such proceedings, each party is entitled to call witnesses, § 10–208(e)(1) and cross-examine witnesses of other parties, § 10–208(e)(3); the agency is to provide a record that includes, among other things, all motions and pleadings, and all documentary evidence that the agency receives, § 10–210; a transcript is to be prepared, § 10–211; and *ex parte* communications are generally forbidden, § 10–213.

Few safeguards comparable to those which applied in *Miner* or *Odyniec* or to those mandated by the Administrative Procedure Act were in place in the proceedings at issue here. The complaint inaugurating the university committee proceedings was not under oath, the proceedings were not public, witnesses were not under oath or subject to cross examination, discovery was not available, and a complete record was not kept. Dr. Arroyo makes no argument that the Veterans' Administration committee proceedings afforded any greater protection to potentially defamed individuals. However great the societal interest in valid science, testimony in proceedings lacking the safeguards outlined above should not be protected by an absolute privilege when that testimony is either false or is given with reckless disregard to whether it is true or false. The circuit court therefore did not err in finding no absolute privilege here.[3]

---

**3.** In a case with some factual similarity to the present one, a California court found an absolute privilege for communications made to the National Institutes of Health during the course of an investigation into allegations of scientific fraud. *Dong v. Bd. of Trustees of Leland Stanford Junior University*, 191 Cal.App.3d 1572, 1593–94, 236 Cal. Rptr. 912 (1987), *cert. denied*, 484 U.S. 1019, 108 S.Ct. 731, 98 L.Ed.2d 680 (1988). There, however, a California statute provided an absolute privilege for statements made to "any ... proceeding authorized by

### The jury instruction on qualified privilege

■ Having found that Dr. Rosen was a public figure for purposes of this case, the trial court correctly instructed the jury that it could find he had been defamed only if he had showed by clear and convincing evidence that Dr. Arroyo published her statements with knowledge of their falsity or with reckless disregard of the truth. *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Dr. Arroyo concedes that that instruction was correct. She argues, however, that the court erred in not further instructing the jury that the standard applied because of a constitutional privilege deriving from Dr. Rosen's status as a public figure. In support of this proposition she cites *Batson v. Shiflett,* 325 Md. 684, 602 A.2d 1191 (1992).

*Batson,* however, actually undermines Dr. Arroyo's position. The trial court in *Batson* had first properly instructed the jury that the plaintiff there, as a public figure in a labor dispute, was required to show actual malice. The court also instructed the jury that the plaintiff had a "conditional privilege" to advise union members. The court then erroneously instructed the jury that the conditional privilege could be lost by a showing of common law malice ("ill will, hostility, hatred, or lack of good faith," *id.* at 732, 602 A.2d 1191), rather than "constitutional" malice. Because the trial court had correctly instructed the jury that it must find actual malice and that that standard was not satisfied by a showing of ill will, hatred, or spite, and that therefore the plaintiff had to show by clear and convincing evidence that the defendants had made defamatory statements knowing them to be false or with reckless disregard as to their truth, the Court of Appeals held that the error of the trial court was harmless. *Id.* at 733, 602 A.2d 1191.

In the present case, the trial court instructed the jury that

law." *Id.,* 191 Cal.App.3d at 1594, 236 Cal.Rptr. 912 (quoting Cal.Civ. Code § 47, subd. 2). There is no equivalent Maryland statute, and Maryland case law does not recognize such a broad rule. *See Gersh v. Ambrose,* 291 Md. 188, 434 A.2d 547 (1981).

"you would answer question two [the question on malice] yes if you are persuaded by clear and convincing evidence that Dr. Arroyo actually knew that what she was saying about Dr. Rosen was untrue. Or you would answer question two yes if you were persuaded by clear and convincing evidence that Dr. Arroyo realized at the time she made her false accusation that her accusation was probably untrue, likely untrue. Or you could answer yes to question Roman numeral number two here if you were persuaded by clear and convincing evidence that she had a reason to doubt whether her accusation was or was not true but she simply avoided doing those things which a reasonable person would do before making that kind of accusation."

Dr. Arroyo complains that the trial court did not explain to the jury why this was the standard for the jury to apply. Although "[i]t would appear appropriate ... for trial courts, when they determine as a matter of law that a defendant is protected by a conditional privilege, to inform the jury ... why it is necessary for them to decide the malice question," *Marchesi v. Franchino*, 283 Md. 131, 134 n. 2, 387 A.2d 1129 (1978), it is nonetheless clear in this case, as it was in *Marchesi* and in *Batson*, that "[b]ased on the court's clear actual malice instructions, the jury's finding of defamation conclusively demonstrated a finding of actual malice." *Batson*, 325 Md. at 733, 602 A.2d 1191. Although the *Marchesi* Court criticized the trial court for omitting reference to the existence of a privilege from the jury instruction, it had declined to include the issue in its writ of *certiorari*. The Court compared the case to *IBEW, Local 1805 v. Mayo*, 281 Md. 475, 379 A.2d 1223 (1977), "where we deemed it unnecessary to decide whether error had been committed by allowing a jury to determine the existence of a conditional privilege, since, in all events, the jury had found knowing falsity or reckless disregard for truth, the effect of which, therefore, was to overcome any possible privilege." *Marchesi*, 283 Md. at 133 n. 2, 387 A.2d 1129. It is clear that the jury in the present case, acting on the instructions quoted above, found that Dr. Arroyo made the statements with knowledge of their falsity or

with a reckless disregard for their truth. We therefore need not decide whether the trial court erred in omitting from its instructions any reference to a privilege, because if there was error, it was harmless.

### Evidence of malice

Dr. Arroyo argues that there was insufficient evidence for the jury to find that she acted with knowledge of the falsity of her statements or with reckless disregard for the truth.

In this area, "an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of U.S.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502, *reh'g denied,* 467 U.S. 1267, 104 S.Ct. 3561, 82 L.Ed.2d 863 (1984) (quoting *N.Y. Times v. Sullivan,* 376 U.S. at 285, 84 S.Ct. at 729). That "requirement of independent review departs from the considerable deference an appellate court normally accords to a fact-finder's determinations." *Reuber v. Food Chemical News,* 925 F.2d 703, 714 (4th Cir.), *cert. denied,* 501 U.S. 1212, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991). Nevertheless, "this standard of review does not transform an appellate court into a super-jury, nor does it give us free reign [sic] to revisit credibility determinations or to redetermine findings of historical fact." *Id.*

 Because a "[p]laintiff will 'rarely be successful in proving awareness of falsehood from the mouth of the defendant himself,'" *Batson v. Shiflett,* 325 Md. at 730, 602 A.2d 1191, (quoting *Herbert v. Lando,* 441 U.S. 153, 170, 99 S.Ct. 1635, 1645, 60 L.Ed.2d 115 (1979)), plaintiffs must normally rely on circumstantial evidence, including evidence of motive and intent. Ill will, hatred, and the desire to injure thus have probative value although they alone "are insufficient to establish actual malice." *Batson,* 325 Md. at 730, 602 A.2d 1191. A review of the record reveals abundant evidence of hostility on the part of Dr. Arroyo toward Dr. Rosen, some of which has been outlined above. There is also evidence of behavior on

Dr. Arroyo's part from which a jury could conclude, even absent the evidence of hostility, that she published statements with knowledge that they were false, or with reckless disregard for their truth or falsity. To give two examples: (1) After the University Committee of Investigation had in effect reversed the Committee of Inquiry on the duplicated data issue, exonerating Dr. Rosen of all charges, Dr. Arroyo faxed to Dr. Bulkley the first, most damaging, page of the Committee of Inquiry's report; (2) Dr. Arroyo charged that Dr. Rosen had listed the article on the spin-trapping of nitric oxide as forthcoming on a grant application and had not informed the granting agency that the article had been withdrawn. In fact, Dr. Rosen had notified the agency of the withdrawal of the article; there was no evidence that Dr. Arroyo had tried to find out if he had done so.

There was therefore sufficient evidence in the record to support a jury finding that Dr. Arroyo published her allegations of misconduct with knowledge of their falsity or with reckless disregard for their truth.

### Invasion of Privacy

■ Dr. Rosen's invasion of privacy claim arose from the dissemination of the Committee of Inquiry report. Dr. Arroyo admitted giving a copy of the first page of the Committee of Inquiry report to her husband and sending it to Dr. Bulkley after he asked to see evidence of her charges. There was also circumstantial evidence from which a jury could conclude that she had given a copy of the report to Patricia Meisol of the Baltimore *Sun*. Dr. Rosen's claim was that dissemination of the report constituted that form of tortious invasion of privacy which the *Restatement* characterizes as "unreasonable publicity given to [another's] private life." *Restatement (Second) of Torts* § 652A(2)(c) (1977).

Dr. Arroyo argues that the information in the report was not private and that dissemination of the information therefore could not be tortious. She correctly points out that "[m]atters of public record ... are not private" and that "no action lies

for the dissemination of a published finding by an administrative board."

The report of the Committee of Inquiry, however, was not a published finding or otherwise a matter of public record. The first page—the page faxed to Dr. Bulkley—is clearly marked "Confidential." The regulations of the university governing the inquiry process reflect a deep concern with the confidentiality of the proceedings. The regulations specify that "[a]ll material [reviewed by the Committee of Inquiry] will be confidential." When the Committee of Inquiry recommends a formal investigation, the regulations permit the university to notify the relevant funding agency depending on the agency's policies or applicable federal regulations. Where regulations do not require such notification, the university is to consider such factors as the presence of an immediate health hazard in determining when to notify the agency. No other dissemination of the report outside the university itself is contemplated by the regulations. Although the specific prohibitions in the regulations apply to conduct by the university rather than by individuals, the regulations make it clear that the report is not a record "open to public inspection." *Restatement*, § 652D comment b, *quoted in Pemberton v. Bethlehem Steel Corp.*, 66 Md.App. 133, 167, 502 A.2d 1101, *cert. denied*, 306 Md. 289, 508 A.2d 488, *cert. denied*, 479 U.S. 984, 107 S.Ct. 571, 93 L.Ed.2d 575 (1986). Dissemination of the report, therefore, could be tortious.

Dr. Arroyo also argues that there was evidence of dissemination to only two or three people, and that "it is not ... an invasion of the right of privacy ... to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons." *Restatement*, § 652D comment a, *quoted in Pemberton*, 66 Md.App. at 166, 502 A.2d 1101. In this case, one of the small group to whom Dr. Arroyo spoke was a reporter for a general circulation newspaper. It could be inferred that Arroyo spoke to the reporter in order to publicize the report as widely as possible. Stories apparently based in part on information obtained from Dr. Arroyo were in fact published. In those circumstances, although the informa-

tion was communicated to a numerically small group, it may be that "the matter must be regarded as substantially certain to become one of public knowledge," *Restatement,* § 652D comment a, and the communication may therefore constitute an invasion of privacy.

We hold that there was sufficient evidence in the record for the jury to find that Dr. Arroyo invaded Dr. Rosen's privacy.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.