716 A.2d 244 (1998)
351 Md. 24
Roland IMPERIAL
v.
Wayne A. DRAPEAU.
No. 103, September Term, 1997.
Court of Appeals of Maryland.
August 27, 1998.
*245 Albert D. Brault (Rhonda A. Hurwitz, Joan F. Brault, Brault, Graham, Scott & Brault, on brief), Rockville, for petitioner.
Barbara R. Graham, Rockville, for respondent.
Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.
RODOWSKY, Judge.
This action was brought by a rescue squad emergency medical technician (EMT) against a physician who wrote identical, allegedly defamatory letters of complaint about the EMT to the Governor and to a member of Congress. As explained below we shall hold that the communications were absolutely privileged.
The Bethesda-Chevy Chase Rescue Squad, Inc. (BCCRS), in addition to its emergency response service, transports patients by ambulance to hospitals under non-emergency circumstances. The latter service is not limited to transportation to the nearest hospital. This litigation arises out of a request made June 28, 1995, by the defendantpetitioner, Dr. Roland Imperial (Imperial), to have the BCCRS transport his patient, Ruth England (England), to Sibley Hospital.
At the time of the events described below England had been Imperial's patient for fifteen years. She was eighty years old and suffered from cancer of the left lung, emphysema, asthma, heart failure, and a chronic duodenal ulcer. During a hospitalization at Sibley from May 17 to June 13, 1995, part of her left lung had been removed. England lived alone in an apartment in Bethesda, tended, at least part of the time, by a nurse's aide. On June 28, 1995, at 11:30 a.m., in response to a telephone call from the nurse's aide, Imperial examined England at her apartment. Imperial found his patient dehydrated, due to diarrhea and vomiting, and with low blood pressure, which Imperial attributed to medications and anemia. He determined that the situation was not an emergency, but that England should be readmitted to Sibley, and he obtained by telephone the consent of one of England's sons to that course of action.
*246 Imperial telephoned BCCRS, spoke with the dispatcher on duty, the plaintiff-respondent, Wayne A. Drapeau (Drapeau), and requested England's non-emergency ambulance transport to Sibley. Imperial had already made arrangements with Sibley to admit his patient. Drapeau advised an ambulance crew to transport England to Sibley, but Drapeau was not a member of the crew that responded. When the ambulance arrived at England's residence the two EMTs comprising the crew found England's blood pressure to be 86/60 and that she was unaware of her surroundings. They determined that, under those circumstances, the applicable protocols required them to take England to the closest hospital, which was Suburban Hospital, rather than Sibley. Imperial does not have privileges at Suburban.
Later that afternoon, when Imperial was unable to locate England at Sibley, he telephoned the BCCRS and spoke with Sergeant Patrick Geraghty, who informed him that England had been transported to Suburban.[1]
Subsequently, on July 6, 1995, Imperial wrote two identical seven-page letters of complaint "RE: Abuse of Authority by Pvt. Wayne Drapeau of the Bethesda Rescue Squad." One letter was sent to Imperial's congresswoman, Constance A. Morella, while the other was sent to Governor Parris N. Glendening. The first three pages of the letter relate England's medical history and emphasize that, when Imperial had telephoned for transportation, he asked for nonemergency service because the situation was not one of acute distress.
The balance of Imperial's letter raises a series of questions, to most of which Imperial gives his personal response. For example, he asks, "Why did Private Wayne Drapeau transport Ruth [England] to the Suburban Hospital Emergency Room?" Imperial's answer is that Drapeau "panicked ... because of low blood pressure" and that he had a "lack of clinical skill and lack of knowledge on how to differentiate between Hypotension and Acute Shock," and that Drapeau's reading of the signs was "clinical incompetence." Imperial asked, "What is the qualification and how much training does Private Wayne Drapeau have to justify countermanding a physician's specific and explicit order to transport Ruth to Sibley Hospital?" In answer Imperial reviewed his own qualifications and submitted that it was on his authority, as the attending physician, that "Drapeau" was even in England's apartment. Asking what the "bad effect of transporting" England to Suburban was, Imperial said that Suburban did not have England's medical history. Suburban did not know that she was "infected with a Methicillin Resistant Staph Aureus" that required isolation, and Suburban did not know that she and her son did not want "heroic measures [taken] to prolong life."
Imperial, answering his own question as to whether Drapeau's action was "unethical and illegal," said that Drapeau countermanded the attending physician's order; he "stole the patient without having the decency to say that he was transporting" England to Suburban; he disrupted fifteen years of excellent patient-physician relationship, and he caused Imperial to lose revenue for the almost twoweek period that he would not be attending England at Suburban.
The letter concluded:
"Can the Rescue Squad be trusted with a sick patient when they disregard the Physician's instruction? Are we giving the Rescue Squad extraordinary power to supercede an Attending Physician's order?
"I bring this to the attention of the office[s] of [the two addressees], to investigate this unethical and illegal misconduct by [BCCRS's] Drapeau. The investigation should be conducted by an Independent External Peer Review with no ties to the Rescue Squad Agency and to the Emergency *247 Room Physician Society, to avoid the allegation of a cover up."
Governor Glendening forwarded his counterpart of the letter to the Maryland Institute for Emergency Medical Services Systems (MIEMSS). The Executive Director of the latter, by letter of August 29, 1995, wrote to Imperial advising that his "letter was received with great concern and a comprehensive review of [Imperial's] patient's care was conducted." MIEMSS said that the EMTs had "acted in the best interest of the patient." England's "status [had] significantly deteriorated by the time the rescue squad arrived." The EMTs assessed England to be "in profound shock" and, on her arrival at Suburban, her blood pressure was "65/30 as a result of a significant gastrointestinal hemorrhage due to the duodenal ulcer." MIEMSS concluded that the EMTs had followed appropriately the applicable MIEMSS protocols.
Congresswoman Morella, stating that she "certainly share[d Imperial's] concern," forwarded Imperial's letter to the County Executive of Montgomery County. The County Executive provided a copy of the letter to the Chief of BCCRS. The BCCRS Chief deliberately withheld replying to Imperial until completion of the MIEMSS investigation. By a three-page, single-spaced letter of September 25, the Chief furnished Imperial with a step-by-step review of the EMTs' actions, concluded that they had acted entirely appropriately, and strongly suggested that Imperial provide a written apology to Drapeau.
Drapeau filed a complaint against Imperial in the Circuit Court for Montgomery County, alleging defamation. After Imperial had moved to dismiss, and Drapeau had amended his complaint, Imperial moved for summary judgment. The court granted the motion, ruling that the publications of the matter complained of were either absolutely privileged or were conditionally privileged, without any evidence of malice.
The Court of Special Appeals, in an unreported opinion, reversed and remanded. That court, in rejecting absolute immunity, said that Imperial's request for an investigation at the end of his seven-page letter "cannot insulate defamatory remarks." The court reasoned that, were it so to hold, "all defamatory statements, if accompanied by a vague request for some kind of an investigation, would be completely immune from redress. That is not, and should not, be the law."
We granted Imperial's petition for certiorari and Drapeau's conditional cross-petition. Of the many issues raised, we need consider only the question of absolute immunity. In doing so we apply the standard of review for a grant of summary judgment, namely, whether the trial court was legally correct. Goodwich v. Sinai Hosp. of Baltimore, Inc., 343 Md. 185, 204, 680 A.2d 1067, 1076 (1996). As we explain below, the circuit court was legally correct in its alternate holding that absolute immunity applied.
The applicability of absolute privilege to circumstances like those here present evolved from the common law rule under which a person is fully protected from any threat of potential liability in defamation for testimony given as a witness in a judicial proceeding. Rosenberg v. Helinski, 328 Md. 664, 676, 616 A.2d 866, 872 (1992), cert. denied, 509 U.S. 924, 113 S.Ct. 3041, 125 L.Ed.2d 727 (1993); Odyniec v. Schneider, 322 Md. 520, 526, 588 A.2d 786, 789 (1991); Miner v. Novotny, 304 Md. 164, 170, 498 A.2d 269, 272 (1985); Adams v. Peck, 288 Md. 1, 3, 415 A.2d 292, 293 (1980); Korb v. Kowaleviocz, 285 Md. 699, 704, 402 A.2d 897, 899 (1979); see also Restatement (Second) of Torts § 588 (1977).
This absolute privilege shields speakers from liability even if their motives were malicious, or they knew the statement was false, or their conduct was otherwise unreasonable. Rosenberg, 328 Md. at 676, 616 A.2d at 872; Odyniec, 322 Md. at 527, 588 A.2d at 789; Adams, 288 Md. at 3, 415 A.2d at 293; Maulsby v. Reifsnider, 69 Md. 143, 164, 14 A. 505, 511 (1888). Moreover, the privilege applies even if the allegedly defamatory statement is irrelevant to the proceeding. Miner, 304 Md. at 171, 498 A.2d at 272; Korb, 285 Md. at 701-02, 402 A.2d at 898.
The longstanding rationale for the privilege is that it is of "great importance to the administration of justice that witnesses *248 should testify with minds absolutely free from the apprehension of being annoyed by civil actions for any thing they may say as witnesses...." Hunckel v. Voneiff, 69 Md. 179,198, 17 A. 1056, 1057 (1889). See Odyniec, 322 Md. at 528, 588 A.2d at 789-90; Miner, 304 Md. at 171, 498 A.2d at 272; Gersh v. Ambrose, 291 Md. 188, 192, 434 A.2d 547, 549 (1981); Adams, 288 Md. at 8, 415 A.2d at 295.
As a matter of public policy, the balance is struck heavily in favor of the free disclosure of information during a judicial proceeding. In order to achieve this balance, those who participate in the judicial process must be able to do so without the specter of potential civil liability for defamation hanging over their heads. Rosenberg, 328 Md. at 676-77, 616 A.2d at 872; Odyniec, 322 Md. at 528, 588 A.2d at 790; McDermott v. Hughley, 317 Md. 12, 23-24, 561 A.2d 1038, 1044 (1989). See also W.P. Keeton & W. Prosser, Prosser and Keeton on the Law of Torts § 114 (5th ed.1984).
This Court, in accordance with the majority of other jurisdictions, has taken a "broad view" of the scope of the privilege, holding that this "important privilege" extends to administrative and other quasi-judicial proceedings. Keys v. Chrysler Credit Corp., 303 Md. 397, 404, 494 A.2d 200, 203 (1985); see also Gersh, 291 Md. 188, 434 A.2d 547. As one commentator has noted:
"There is no precise definition of what qualifies as a `judicial proceeding' for the purposes of the absolute privilege; but it clearly extends to tribunals other than courts. The term is employed in a flexible fashion to embrace any governmental proceeding involving the exercise of a judicial or quasi-judicial function, including a wide variety of administrative boards, commissions, or other tribunals which may engage in judicial or quasi-judicial action though not part of the court system."
R.A. Smolla, Law of Defamation § 8.03[3][a] (1986,1996 Supp.) (footnotes omitted).
In Gersh, this Court declined to extend the judicial privilege to cover voluntary statements made by a witness testifying before the Baltimore City Community Relations Commission. Testimony before that commission, we reasoned, was functionally equivalent to that at "an ordinary open public meeting," at which there were no procedural safeguards for a person who might be defamed. Gersh, 291 Md. at 196, 434 A.2d at 551. Thus, "[t]he public benefit to be derived from testimony at Commission hearings of this type is not sufficiently compelling to outweigh the possible damage to individual reputations to warrant absolute witness immunity." Id.
Whether statements in an administrative proceeding are within the ambit of the absolute privilege is "decided on a case-bycase basis and ... in large part turn[s] on two factors: (1) the nature of the public function of the proceeding and (2) the adequacy of procedural safeguards which will minimize the occurrence of defamatory statements." Id. at 197, 434 A.2d at 551-52.
Nor is the privilege limited to testimony given as a witness in the course of a hearing, whether judicial or administrative. In Miner, 304 Md. 164, 498 A.2d 269, this Court, applying the two Gersh factors, held that the absolute privilege protects a citizen who files a brutality complaint against a police officer. In that case Novotny, within two days of his arrest for driving while intoxicated, filed a sworn complaint against the arresting officer with the officer's superior, alleging that Novotny had been kicked, choked, and otherwise abused during and after his arrest. After an internal investigation had found no misconduct, the officer sued Novotny for defamation. Id. at 166, 498 A.2d at 270.
This Court recognized that the abuse of the "formidable power" vested in law enforcement officers is "extremely detrimental to the public interest." Id. at 176, 498 A.2d at 274-75. We said:
"Citizen complaints of such abuses, and the administrative disciplinary procedure which has been developed to investigate these complaints, serve a public function of vital importance by providing a mechanism through which abuses may be reported to the proper authorities, and the abusers held accountable.

*249 "The viability of a democratic government requires that the channels of communication between citizens and their public officials remain open and unimpeded. Were complaints such as Novotny's not absolutely privileged, the possibility of incurring the costs and inconvenience associated with defending a defamation suit might well deter a citizen with a legitimate grievance from filing a complaint."
Id. at 176, 498 A.2d at 275.
Further, in the investigation resulting from Novotny's complaint, and at any disciplinary hearing that might result, the officer would enjoy the protections of the "Law-Enforcement Officers' Bill of Rights," Maryland Code (1957, 1996 Repl.Vol.), Art. 27, §§ 727 through 734D. Miner, 304 Md. at 173, 498 A.2d at 273. This Court held that the procedural safeguards under that statute were sufficient to protect the officer. Id. at 174-75, 498 A.2d at 274. In particular, we noted that the statute required that a police brutality complaint be under oath and, in the case of an adult victim, be made by a person having personal knowledge; the statute imposed criminal penalties for false complaints; it provided for mechanisms to inform the officer of the subject of the investigation; and it guaranteed the officer the right to be represented by counsel when interrogated. Id. Additionally, any hearing was adversarial, with witnesses under oath and subject to cross-examination. Id. at 175, 498 A.2d at 274.
In Odyniec, 322 Md. 520, 588 A.2d 786, this Court held that the witness privilege extended to statements made by a physician while medically examining the claimant in a personal injury action. The reported case involved a sequence of three physicians. The first physician had operated on the patient's knee, with a poor result. The patient consulted the second physician who concluded that the first physician had lacerated the patient's popliteal artery, which the second physician repaired. The patient then filed a claim with the Health Claims Arbitration Office (HCAO) against the first physician for medical malpractice. In preparing to defend, the first physician arranged to have the patient examined by a third physician. In the course of that examination the third physician told the patient that she had been lied to by the second physician and that the first physician had never ligated the popliteal artery. The reported decision was rendered in the defamation action brought by the second physician against the third physician.
The claim was defended on the ground of absolute witness immunity. In opposition, the plaintiff contended (1) that the HCAO was not exercising any judicial or quasi-judicial functions, (2) that the third physician's statements exceeded his potential function as a witness before the HCAO, (3) that no judicial safeguards were present, (4) that a particular HCAO panel does not exercise any judicial power, and (5) the expert's statements were not before the HCAO panel but "were uttered in a setting lacking all attributes of an adversary proceeding," i.e., a medical examination. Id. at 525-26, 588 A.2d at 788-89.
Rejecting these arguments, this Court reasoned:

"Gersh, Miner, and McDermott [discussed infra ] thus stand for the proposition that absolute witness immunity will not be extended to a nonjudicial proceeding unless the same policy considerations which underlie the application of the privilege in the judicial sphere are also present. It must appear from the nature and conduct of the proceeding that society's benefit from unfettered speech during the proceeding is greater than the interests of an individual who might be defamed during that proceeding."
Id. at 531, 588 A.2d at 791.
On balance, this Court concluded that the privilege applied. Requisite procedural safeguards were present in an HCAO proceeding which was "at least as functionally comparable to a trial before a court as the administrative disciplinary proceedings involved in Miner." Id. at 534, 588 A.2d at 792. Further,
"[t]he social benefit derived from free and candid participation by potential witnesses in the arbitration process is essential to achieve the goal of a fair and just resolution of claims of malpractice against health *250 care providers. At the same time, we are mindful of the damage that may be done to a health practitioner's reputation by a defamatory statement. But balancing the potential harm caused by such statement made during the pendency of the arbitration process against the societal value of maintaining the integrity of the process itself, we accord greater weight to the latter. The strong public policy considerations which led us to accord an absolute privilege in Adams and Miner are equally present in the circumstances of the present case."
Id. at 534-35, 588 A.2d at 793. See also Adams, 288 Md. at 8-9, 415 A.2d at 295-96 (document prepared by psychiatrist for use in connection with a pending divorce proceeding held to be absolutely privileged); Arundel Corp. v. Green, 75 Md.App. 77, 83-85, 540 A.2d 815, 818-19 (1988) (citing Restatement (Second) of Torts § 586 & cmts. a, e (1977)) (holding that attorney's statements prior to commencement of litigation were absolutely privileged).
In McDermott, 317 Md. 12, 561 A.2d 1038, we declined to extend the privilege to a psychological report prepared at the request of an individual's employer. In that case, the plaintiff was a trainee Park Police Officer with the Maryland-National Capital Park and Planning Commission. One aspect of the training involved horse-mounted field patrolling. During these exercises the plaintiff experienced physical and psychological trauma and asked on multiple occasions that he be excused from the exercises. His employer ordered that he consult a psychologist. The plaintiff claimed that the report ultimately prepared by the psychologist was defamatory; the doctor in turn claimed, inter alia, an absolute privilege for participants in a judicial proceeding. Id. at 15-16, 21-22, 561 A.2d at 1040, 1043.
We held that the "insufficient procedural safeguards" outweighed whatever public value was to be found in having mental health care professionals insulated from liability over their diagnoses. Id. at 26, 561 A.2d at 1045. In particular, "[t]here was no legally cognizable tribunal administering the proceeding; there was no public hearing adversary in nature; no compellable witnesses were sworn or cross-examined; no reviewable opinion or analysis was generated; and, most significantly, [the plaintiff] did not have the opportunity to present his side of the story." Id.
In the instant matter Drapeau cites Arroyo v. Rosen, 102 Md.App. 101, 648 A.2d 1074 (1994), where the Court of Special Appeals declined to extend the absolute privilege for participants in judicial proceedings to statements made to academic bodies of inquiry by one scientist reporting allegedly unscientific practices by another scientist. Ultimately, most of the charges were found to be untrue; a defamation suit ensued, and the defamed scientist was awarded damages.
The author of the defamatory statements urged an extension of the privilege to cover "testimony before bodies investigating allegations of scientific misconduct," and argued that the public issue at stake included "the interest of society in the soundness of [scientific] research." Id. at 108, 648 A.2d at 1077. In declining to extend the privilege, then-Chief Judge Wilner wrote for the court that the total lack of procedural safeguards protecting a scientist who might be defamed before a private inquiry board was a consideration sufficient to outweigh the public's interest in good science.
Present in the instant matter are the factors that give rise to the absolute privilege. First, the importance to the public that all medical participants in the emergency medical system be competent is self-evident. Indeed, the General Assembly has made a legislative finding to that effect in Maryland Code (1978, 1997 Repl.Vol.), § 13-502 of the Education Article (Ed.).
"(4) The citizens of Maryland are fortunate to have highly trained career and volunteer fire fighters, emergency medical technicians, and rescue squad personnel providing life-sustaining services in the field to ill and injured persons."
Because the quality of pre-hospital, emergency medical care can literally be a matter of life and death, it carries a very high priority. Accordingly, public policy encourages the communication of information to public authorities *251 responsible for maintaining the quality of emergency medical services. Fear of a potential defamation action discourages the reporting of any complaints, including those that the monitoring authorities would conclude, after investigation, are meritorious.
In the instant matter there are procedural safeguards that adequately protected the reputation of a subject of a complaint about emergency medical service. The subject complaint was investigated by MIEMSS. MIEMSS is an independent state agency, located at the University of Maryland, Baltimore. Ed. § 13-503(b). The governing body of MIEMSS is the Emergency Medical Service Board (the EMS Board). Ed. § 13-503(c). The principal statutory duty of the EMS Board is to "develop and adopt an Emergency Medical System plan to ensure effective coordination and evaluation of emergency medical services delivered in this State." Ed. § 13-509(a). To that end the Executive Director of MIEMSS is to "[c]oordinate the training of all personnel in the Emergency Medical Services System and develop the necessary standards for their certification." Ed. § 13-510(4).
Any action, adverse to Drapeau, resulting from the investigation by MIEMSS could not be taken without Drapeau's consent or without complying with the contested cases subtitle of the Maryland Administrative Procedure Act, Md.Code (1984, 1995 Repl.Vol.), §§ 10-201 through 10-227 of the State Government Article (SG). Different paths, however, lead to that conclusion. There are various classifications of EMTs and, in 1995, the agency with ultimate disciplinary authority depended upon the class of EMT complained of.
The letter to Imperial from MIEMSS advised that the responding EMTs had used "the Maryland Medical Protocols for Cardiac Rescue Technicians and Emergency Medical Technician-Paramedics" to determine England's need. One inference from the use of these protocols is that at least one of the two responding EMTs was an EMT-Cardiac. A resident EMT-Cardiac (who is not a student) must have completed a course approved by the State Board of Physician Quality Assurance (the P.Q.A. Board) and by the Director of Emergency Medical Services. That individual also must have been examined and certified as an EMT-Cardiac by the P.Q.A. Board. Md.Code (1981, 1994 Repl.Vol.), § 14-303(a) of the Health Occupations Article (HO); see also HO § 14-101(b). The P.Q.A. Board is authorized to reprimand or place on probation an EMT-Cardiac, or suspend or revoke the certification of an EMT-Cardiac, for any conduct prohibited under HO § 14-303 or under any regulation adopted by the P.Q.A. Board. HO § 14-303(c). Before any disciplinary action can be taken under HO § 14-303, the EMT-Cardiac is entitled to a hearing, as provided by HO § 14-405(a). At this hearing the Maryland Administrative Procedure Act applies "except that factual findings shall be supported by clear and convincing evidence," a higher standard than that ordinarily applicable to administrative proceedings. HO § 14-405(b). There are rights of review, first by the Board of Review of the Department of Health and Mental Hygiene, and then by a circuit court. HO § 14-408(a).
If at least one of the responding EMTs was an EMT-Paramedic, a classification more highly skilled than EMT-Cardiac, HO § 14-305 would apply. An EMT-Paramedic must be certified by the P.Q.A. Board. Violations by an EMT-Paramedic of § 14-305, or of any regulation adopted thereunder, are subject to the same sanctions as are EMTs-Cardiac, and EMTs-Paramedic enjoy the same procedural safeguards under HO § 14-405 as do EMTs-Cardiac.
In his letter to Imperial the BCCRS Chief describes the two responding members of the rescue squad as "Emergency Medical Technicians-Ambulance personnel [ (EMT-A) ]." An EMT-A is an individual "who has been tested and certified by MIEMSS to provide basic life support." Maryland Regs.Code tit. 10, § 32.06.01B(6) (1980). EMT-A is a less skilled classification than EMT-Cardiac. MIEMSS establishes the qualifications for EMTs-A. See MIEMSS, EMT-A Testing & Certification Policies §§ 1-10 (July 1989). MIEMSS also determines whether an EMT-A should be decertified. One ground for decertification is "[p]ractice or performance [by an EMT-A] of any medical act not specified *252 in the MIEMSS course objectives, or protocols as developed and/or approved by MIEMSS, consistent with the highest level of certification held by the prehospital care provider." Id. § 10.1.5. "Omission of a medical act specified in the MIEMSS course objectives or protocols" is also a ground for decertification by MIEMSS. Id. § 10.1.6.
The MIEMSS decertification procedure begins with the referral of any complaint that has been received to the local Emergency Medical System Authority. Id. § 10. The local authority's investigation "shall be made confidentially," although the individual against whom the complaint has been filed "shall be notified at the investigation stage that the investigation is in process." Id. The local Emergency Medical System Authority submits findings and a recommendation to the Director of MIEMSS. Before the Director of MIEMSS may order any disciplinary action, written notice, stating the issues or charges, must be sent by certified mail to the subject of the complaint and to the local authority at least thirty days before the hearing. Id. Any hearings before the Director of MIEMSS are to be conducted in accordance with the Maryland Administrative Procedure Act. Id.[2]
Drapeau contends that the absolute privilege for witness testimony, as extended, cannot reach the instant matter because Imperial's complaint was not made directly to the appropriate body exercising disciplinary authority. We reject so technical a restriction on the privilege. The ordinary citizen need not, at the peril of defending a defamation action, sort through the complexities of governmental organization in a system of dual sovereigns, with county, municipal, and special taxing district overlays on the State component. This case is particularly illustrative. As we have seen above, in 1995, the power to discipline EMTs was divided between two agencies, both of the State, whose authority to discipline depended on the level of certification of the EMT.[3] A complainant cannot be expected to discern those nuances. Rather, it was appropriate for Imperial to invoke the "constituent service" aspect of representative government in order to have the complaint reach the governmental agency that was charged with the responsibility to investigate. Cf. Narez v. Wilson, 591 F.2d 459, 461 & n. 9 (8th Cir.1979) (interpreting a Marine's threat to "write his Congressman" as a request to have pending disciplinary action reviewed by an administrative board); Ward v. United States, 1 Cl.Ct. 46, 48 (1982) (Coast Guard officer who was denied retirement benefits was informed that he could "write his Congressman" for legislative relief); Cushman v. Edgar, 44 Or.App. 297, 302, 605 P.2d 1210, 1212 (Or.Ct.App.1980) (absolute privilege applied to defamation defendant's letter, written to Governor, requesting investigation by Attorney General of alleged police brutality).
Imperial's complaint in fact reached the appropriate investigating authority, and, under the facts of this case, that is all that was required to bring this case within the rule of Miner, 304 Md. 164, 498 A.2d 269.
JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A JUDGMENT AFFIRMING THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTCOSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT, WAYNE A. DRAPEAU.
Dissenting opinion by CHASANOW, J., in which BELL, C.J., and WILNER, J., join.
*253 Dissenting opinion by CHASANOW, Judge, in which BELL, Chief Judge, and WILNER, Judge, join.
The majority, in effect, creates a new absolute judicial proceedings privilege to maliciously write knowingly false and defamatory letters to high executive and legislative officials as long as the defamation relates to a matter that might conceivably be investigated by some state or federal administrative hearing board or agency. Instead of claiming these letters are protected by the judicial proceedings privilege, the majority should recognize that these libelous letters are not incident to any judicial proceedings and that its decision creates a previously unrecognized "absolute constituent services privilege." There is no basis for immunizing these maliciously libelous letters through the judicial proceedings privilege because there is no nexus between these letters and any judicialtype proceedings.
Since the circuit court granted summary judgment in favor of the defendant Dr. Roland Imperial on plaintiff Wayne Drapeau's libel complaint, we must take all facts and their reasonable inferences in the light most favorable to the plaintiff Wayne Drapeau. This means we must assume that Imperial's allegations of "unethical and illegal misconduct" by Drapeau were maliciously made with full knowledge of their falsity, that their target was an individual who was not a public official or a public figure, and that they were disseminated in a manner that assured the maximum damage to their victim. We can imagine the distress Drapeau felt when he was informed by his rescue squad chief that the Governor, his Congressperson, and his County Executive had all demanded an investigation because they were "concerned" by the allegations of his "unethical and illegal misconduct." It is clear from the record, and is apparently conceded, that Drapeau did his job competently and properly and that he has never had any sort of hearing where he had an opportunity to present his side of the story. Imperial should have known that the Governor and a member of Congress would not personally conduct an investigation, but would circulate the letters to others for action. Furthermore, Imperial had no reason to believe that he would ever have to testify under oath or be cross-examined about his allegations at any judicial-type proceeding, and in fact, there never was any hearing of any kind.
What is the judicial proceeding that provides a basis for Imperial's absolute judicial proceedings privilege? The majority suggests that the judicial proceeding that gives rise to the absolute judicial proceedings privilege is a judicial-type hearing before the Maryland Institute for Emergency Medical Services System (MIEMSS) and that "there are procedural safeguards that adequately protected the reputation of a subject of a complaint about emergency medical service." 351 Md. 38, 51, 716 A.2d 244, 251 (1998). This is based on the conclusion that "[a]ny action, adverse to Drapeau, resulting from the investigation by MIEMSS could not be taken without Drapeau's consent or without complying with the contested cases subtitle of the Maryland Administrative Procedure Act, [Maryland] Code (1984, 1995 Repl.Vol.), §§ 10-201 through 10-227 of the State Government Article...." 351 Md. at 51, 716 A.2d at 251. What the majority does not seem to appreciate is that the more blatantly false and irrelevant the allegations, the less likely that the person libeled will get any judicial-type hearing or any judicial vindication. The only way there could be any MIEMSS judicial-type hearing would be if: 1) the Governor or Congresswoman Morella forwarded the letters to MIEMSS contrary to Imperial's request that any investigation not be performed by any established rescue squad agency; 2) Drapeau had MIEMSS certification that could be revoked as the result of the alleged conduct; 3) a complaint about non-emergency transportation came under MIEMSS jurisdiction; and 4) a MIEMSS preliminary examination of the complaint disclosed that the allegations had enough substance to warrant a hearing. There is no reason to believe the latter three prerequisites were met, and a hearing did not occur. It was unlikely that Imperial sought or expected a judicial-type proceeding, but according to the majority, he is nevertheless entitled to the absolute judicial proceedings witness privilege.
*254 Any analysis of the majority's extension of the judicial proceedings privilege must include an examination of the libelous communication Imperial directed to the Governor and his Congresswoman. As Imperial indicates in his letters, he called the Bethesda-Chevy Chase Rescue Squad, Inc.'s (BCCRS) non-emergency telephone number to arrange non-emergency transportation for Ms. Ruth England to a hospital in the District of Columbia, and the dispatcher he spoke to was Drapeau. We know from the record that BCCRS is a privately funded, non-profit corporation that provides emergency transportation as well as private, non-emergency transportation services to a hospital of the patient's choice. It is not a governmental organization and receives no state funds. BCCRS is one of only two rescue squads in Montgomery County that provide this nonemergency service to a hospital of the patient's choice. Had Ms. England not lived in the Bethesda/Chevy Chase area, her nonemergency transportation to a hospital might have been by a private ambulance service or even a taxicab. Moreover, Imperial had no reason to suspect that Drapeau, whom Imperial knew to be the dispatcher who answered the non-emergency call, would leave his post as dispatcher to participate in the transportation of Ms. England.
In searching for any nexus between Imperial's libelous letter and a MIEMSS hearing with sufficient judicial safeguards, we should examine the nature of Imperial's complaint. Imperial did not, and could not, complain that his patient failed to receive excellent medical care from the ambulance personnel or the hospital to which she was taken. The ambulance personnel may have saved Ms. England's life since when they arrived she was semi-conscious, non-verbal, and in a hypotensive condition. Ms. England's blood pressure had dropped to 65/30 as the result of a significant gastrointestinal hemorrhage. Ms. England could not communicate with the rescue squad personnel, and, based on Ms. England's condition, rescue squad procedures required that someone in her condition be taken to the closest hospital. If anything, Imperial's complaint almost seemed to be that Ms. England should not have been taken to the closest hospital because she and her son "did not want heroic measures to prolong life." Imperial cannot suggest that Drapeau's actions in any way caused patients and staff at Suburban Hospital to be exposed to a dangerous infectious condition, since Imperial did not think Ms. England's condition was contagious enough to inform the rescue squad of her infection. If Ms. England's condition was dangerous to others, then Imperial should have told the rescue squad of the condition and the need to take precautionary measures to protect ambulance personnel and other patients who might later be transported in the same ambulance. Imperial's primary complaint to Governor Glendening and Congresswoman Morella seemed to be his complaint that, because of her condition, Ms. England was taken to the closest hospital and that hospital did not grant him privileges, and "as a result[,] I have lost revenue for almost 2 weeks that I am not attending Ruth [England] at a critical stage of her life." If these libelous letters are absolutely privileged, any constituent letter maliciously libeling a private citizen is absolutely privileged as long as the letter ends with a vague request for an investigation and some unidentified administrative agency might conceivably have jurisdiction to hold a hearing.
The majority must recognize that in order to have a judicial proceedings privilege there must be a judicial proceeding or an administrative proceeding with sufficient judicial safeguards. The primary basis for the majority's finding of an absolute judicial proceedings privilege is its speculation that Imperial was seeking a decertification hearing for Drapeau by MIEMSS. This is not only improper appellate fact finding, it is contradicted by the facts in the record. The only way the majority can conclude that MIEMSS had any investigatory authority over the matter of Ms. England's transportation is to start with the assumption that Imperial knew that Drapeau had some sort of MIEMSS certification that could be withdrawn after a hearing, and that is what his letters sought. This initial assumption is unwarranted. It is based in part on the majority's supposition, from a post-investigation letter, that one of the two responding ambulance personnel was *255 an EMT-Cardiac and the other an EMTParamedic and that both categories could be decertified after a hearing. Imperial knew Drapeau, the person he libeled, was the dispatcher to whom he spoke. Neither Imperial nor MIEMSS had any basis for believing that the dispatcher was one of the people that actually transported Ms. England. To the contrary, it is highly unlikely that a dispatcher on duty would leave his post to participate in a non-emergency transport into another jurisdiction. Even if such speculation was warranted, it is irrelevant because this complaint concerned the failure to provide a non-emergency transport.
It is also unclear whether MIEMSS even had jurisdiction to hear Imperial's complaint. First, the request for transportation related to non-emergency services. If a taxicab or a private ambulance decided that Ms. England's condition and inability to communicate required changing plans and transporting her to the closest hospital, that transportation should be of no concern to MIEMSS. Second, MIEMSS's authority in 1995 did not extend to dispatchers. See generally Code of Maryland Regulations (COMAR) 30.09 et seq. Even emergency dispatchers will not be licensed by MIEMSS until December 31, 1998. Cf. Md.Code (1978, 1997 Repl.Vol., 1997 Supp.), Education Art., § 13-516. Moreover, any speculation that Imperial was seeking a MIEMSS hearing with its judicial safeguards is further contradicted by his own letters. Imperial expressly states in his letters that, "to avoid the allegation of a coverup," he does not want the investigation to be performed by any "Rescue Squad Agency."
Drapeau never was given any forum at all, let alone a judicial-type hearing, to respond to Imperial's libel. MIEMSS did not hold any hearing. The director simply wrote Imperial acknowledging he had reviewed the letter to Governor Glendening and conducted a "comprehensive review of your patient's care." The director explained that "[t]he emergency medical technicians that responded to your patient used the Maryland Medical Protocols for Cardiac Rescue Technicians...." The letter concluded, "it is my opinion that the emergency medical technicians acted in the best interest of the patient." The letter does not discuss Drapeau except to note that he was the dispatcher who "received your call." Drapeau has never had any "judicial proceedings" to present his defense and clear his name, yet the majority holds Imperial's libel is somehow protected by the judicial proceedings privilege.
From this record a jury could reasonably conclude that Imperial's libelous letters were not for the purpose of seeking a MIEMSS hearing, but instead were for the purpose of doing as much damage as possible without Drapeau having any opportunity to defend himself, and that is exactly what the letters accomplished. Congresswoman Morella is certainly a reasonable person, and she did not view Imperial's letter to be a request for a hearing by any state agency or licensing board. She viewed the letter as questioning Drapeau's ability to perform his job and sent the letter to the Montgomery County Executive, who then forwarded it to Drapeau's employer. Any reasonable jury could reach the conclusion that Imperial's goal was to have Drapeau disciplined or fired. Since BCCRS is a private, non-governmental corporation and since Drapeau was an at-will employee, he could be disciplined or fired in response to concerns expressed by the Governor, County Executive, and a member of Congress without any judicial-type hearing or due process protections and probably without a hearing of any kind. The majority does not attempt to say, and it could not say, that any disciplinary proceedings by a private rescue squad would have the due process protections of a judicial proceeding. I am also confident that the majority would recognize that, had Imperial sent this letter directly to Drapeau's chief in an attempt to get him fired or disciplined, there would be no absolute judicial proceedings privilege, see, e.g., McDermott v. Hughley, 317 Md. 12, 561 A.2d 1038 (1989). The majority, however, holds that routing the letter through a Congressperson and/or the Governor apparently gives rise to the judicial proceedings privilege. Even if I were to accept the majority's absolute judicial proceedings privilege extension, there is still a question of fact that makes summary judgment inappropriate. It would be for the trier of fact, not an appellate court, to decide whether Imperial's *256 letters were dispatched for the purpose of initiating a MIEMSS administrative hearing or for the purpose of having Drapeau disciplined or fired by the private corporation that employed him.
The law of defamation balances the need for people to be able to speak freely against the right of a person to seek redress for the injury inflicted by another. In some circumstances, the right to redress for injury yields to the public need for free and unrestrained speech. Miner v. Novotny, 304 Md. 164, 498 A.2d 269 (1985), is the primary authority for the majority's extension of the absolute judicial witness immunity to the instant case. In Novotny, we discussed when that absolute privilege will be extended and said: "`[[T]he question of] whether absolute witness immunity will be extended to any administrative proceeding will have to be decided on a case-by-case basis and will in large part turn on two factors: (1) the nature of the public function of the proceeding and (2) the adequacy of procedural safeguards which will minimize the occurrence of defamatory statements.'" 304 Md. at 172, 498 A.2d at 273 (quoting Gersh v. Ambrose, 291 Md. 188, 197, 434 A.2d 547, 551-52 (1981)). For at least three separate reasons, that test should not provide absolute judicial witness immunity in the instant case.
The first reason why Imperial should not have absolute judicial proceedings witness immunity is that, because the libel was so obviously false, there never were any proceedings, judicial or otherwise, for Drapeau to clear his name. As previously discussed, the only way Drapeau might conceivably receive a MIEMSS hearing would be if Imperial's allegations of incompetency and misconduct had some basis in fact and were relevant to providing emergency services; only then would there be a hearing to decertify Drapeau and only then would he have an opportunity to be heard and formally exonerated. Because the allegations of wrongdoing by Drapeau were obviously false and/or irrelevant to the business of MIEMSS, there was only a cursory investigation by the director and there has never been any judicial-type hearing or any adjudicatory finding that Imperial's libel was unfounded. There were no judicial-type proceedings, and it was unlikely that, based on these complaints, there ever would be a judicial-type proceeding by MIEMSS.
The second reason why these libelous letters should not enjoy absolute immunity is that there is little or no societal benefit to constituent services letters that would justify an absolute immunity rather than a qualified immunity. Public access to the judicial system without fear of being sued is important, but public access to the Governor and members of Congress to complain about nongovernment officials whose activities might possibly come under the jurisdiction of some board or agency is far less important. Any social benefit derived from encouraging free and candid requests for investigations made to the Governor or a member of Congress is far less than the social benefit derived from free and candid access to judicial proceedings. I doubt if members of Congress or high public officials would think it desirable that people who send them complaints or ask for investigations should know that there is absolute immunity, even if the communications are knowingly false and maliciously dispatched. The time of public officials should not be squandered on investigations of false charges made maliciously or with no belief in their truth. On the other hand, the damage to the individual defamed in such a communication is obvious since a conscientious public official will probably forward the libelous communication to others for appropriate action along with their expression of concern. We can assume that a libelous letter forwarded to one's private employer by the Governor or a member of Congress together with an expression of concern does far more damage than the libelous letter alone. There is no public need for the extension of the absolute judicial proceedings immunity to requests for constituent services, even if those services might include administrative investigations of private individuals.
The third reason why there should be no absolute immunity is that there are no procedural safeguards surrounding Imperial's request that the Governor and Congresswoman Morella take action against Drapeau. Since *257 Congresswoman Morella knew Imperial's complaint did not implicate Congress or the federal government, she did what Imperial might have hoped she would doshe forwarded it, along with her expression of concern, to the County Executive who forwarded it to Drapeau's employer. What procedural safeguards or opportunity to respond did Drapeau have with Congresswoman Morella, with the County Executive, or even with his corporate employer? The answer is none. The safeguards in a judicial proceeding or in some administrative hearings that permit absolute witness immunity include the oath witnesses take, the opportunity for cross-examination, and the opportunity to be heard by the party maligned. In addition, the party maliciously initiating a knowingly false judicial proceeding can often be liable for sanctions that can include costs, attorneys' fees, and even a malicious prosecution recovery in some instances. No such safeguards were afforded Drapeau for these libelous letters.
Because Imperial did not make his complaint directly to MIEMSS, he avoided any potential criminal liability for a bad faith malicious complaint. See COMAR 30.09.12.02 (prohibiting groundless, malicious, or bad faith complaints to MIEMSS); COMAR 30.09.12.08 (establishing criminal sanctions for violations of complaint provisions contained in subtitle 9 of MIEMSS regulations). This is a further reason why judicial proceedings immunity should only be given to complaints made directly to MIEMSS.
The majority quotes from McDermott, supra, where this Court declined to extend the absolute judicial proceedings privilege to a psychological report prepared at the request of a probationary police officer's supervisor as part of an administrative investigation. The report ultimately led to the probationary employee's termination. The reason why this Court held that the psychologist's letter was not given absolute immunity by the judicial proceedings privilege was that "`[t]here was no legally cognizable tribunal administering the proceeding; there was no public hearing adversary in nature; no compellable witnesses were sworn or cross-examined; no reviewable opinion or analysis was generated; and, most significantly, [the plaintiff] did not have the opportunity to present his side of the story.'" 351 Md. at 49, 716 A.2d at 250 (quoting McDermott, 317 Md. at 26, 561 A.2d at 1045). That quote is directly applicable to the instant case, and the reasons why the letter used in the administrative investigation in McDermott was not absolutely privileged are equally applicable to the letters in the instant case.
A final, perplexing aspect of the majority's opinion is its determination that immunity is based on to whom the libelous communication might ultimately be forwarded, rather than on to whom the libel is actually addressed and sent. The majority characterizes as too "technical a restriction" the fact that the complaint was not made to the appropriate body exercising disciplinary authority. 351 Md. at 53, 716 A.2d at 252. Even if Imperial had an absolute privilege for communications to MIEMSS, it would not be unduly burdensome to require that, in order to maintain the privilege, he ascertain the appropriate agency to investigate the complaint, rather than permitting unnecessary publication of libel to high executive and legislative officials who obviously would not investigate or hold any type of hearing. By not sending his complaint directly to MIEMSS, he avoided the potential for criminal liability for a false and malicious complaint. Even if a complaint to MIEMSS would be privileged, Drapeau should be entitled to have a trier of fact, not an appellate court, decide whether Imperial used an inappropriate method of publication. In Hanrahan v. Kelly, 269 Md. 21, 305 A.2d 151 (1973), this Court stated that where there is a privilege,
"`[a]ny reasonable and appropriate method of publication may be adopted which fits the purpose of protecting the particular interest. * * * In all such cases, the fact that the communication is incidentally read or overheard by a person to whom there is no privilege to publish it will not result in liability, if the method adopted is a reasonable and appropriate one under the circumstances.' " 269 Md. at 37, 305 A.2d at 160-61 (quoting PROSSER, LAW OF TORTS § 110, at 820 (3d ed.1964)). A jury in the instant case could *258 easily find that sending these letters to the Governor and/or a member of Congress constituted unreasonable and inappropriate methods of publication, even if the same letters would have been privileged if sent directly to MIEMSS.
The error of failing to consider the actual addressee of the libelous communication and instead considering only a secondary recipient is compounded by holding that the letters are absolutely immunized by the judicial proceedings privilege rather than perhaps given qualified immunity by a privilege such as fair comment on matters of public concern or a similar qualified privilege. The majority holds that Imperial's letters were absolutely privileged, so it does not discuss qualified privilege. The Court of Special Appeals found there was sufficient evidence of malice to defeat a qualified privilege, but also reversed the trial judge's decision that there was a qualified privilege for these letters. I do not necessarily agree with that portion of the Court of Special Appeals opinion dealing with qualified privilege and would note that it is possible that these letters enjoy a qualified privilege. PROSSER AND KEETON ON TORTS lists several qualified privileges adopted by other courts that might conceivably provide qualified immunity for Imperial's letters. Those qualified privileges include "communications made to those who may be expected to take official action of some kind for the protection of some interest of the public * * * [as well as] fair comment on matters of public concern." W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS § 115, at 830-31 (5th ed.1984). Any qualified immunity that Imperial might have would of course be limited.
"The condition attached to all such qualified privileges is that they must be exercised in a reasonable manner and for a proper purpose. The immunity is forfeited if the defendant steps outside of the scope of the privilege, or abuses the occasion. Thus, qualified privilege does not extend, in any of the above cases, to the publication of irrelevant defamatory matter with no bearing upon the public or private interest which is entitled to protection; nor does it include publication to any person other than those whose hearing of it is reasonably believed to be necessary or useful for the furtherance of that interest." (Footnotes omitted).
W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS § 115, at 832 (5th ed.1984).
If Imperial did enjoy qualified immunity for his letters, Drapeau would finally have an opportunity for a judicial proceeding to clear his name, since the record establishes that there was sufficient evidence for a jury to find malice. To have a qualified privilege, Imperial would have to show he was motivated by public interest or public concern, and not merely by retribution because his orders were not carried out and he lost income as a result. In addition, any privilege would be defeated by a showing of malice.
For the reasons stated, this Court should not give Imperial absolute immunity for his maliciously libelous letters. I respectfully dissent.
Chief Judge BELL and Judge WILNER have authorized me to state that they join in the views expressed in this dissenting opinion.
NOTES
[1] Imperial's position is that, when he telephoned the BCCRS, he was told that Drapeau was the person who decided that England should be taken to Suburban. Sergeant Geraghty recalls the conversation with Imperial concerning where Imperial's patient had been taken, but Sgt. Geraghty has no recollection of telling Imperial that Drapeau had made the decision, and states that it would have been contrary to his usual practice to do so. The conflict, if such it is, is not material to our disposition of this matter as a question of law.
[2] The MIEMSS EMT-A testing and certification policies in terms refer to "the provisions set forth in the University of Maryland Administrative Procedure Act." So far as our research and investigation disclose, there is no such administrative procedure act. Consequently, we interpret the terms used by MIEMSS as an imprecise reference to the State Administrative Procedure Act, SG §§ 10-201 through 10-227.
[3] Effective December 31, 1998, HO §§ 14-303 and 14-305 are repealed by Chapter 201, § 3 of the Acts of 1997. The new licensing provisions are set forth in Md.Code (1978, 1997 Repl.Vol., 1997 Cum.Supp.), Ed. (future) § 13-516. One purpose of Chapter 201 of the Acts of 1997 was to repeal "the authority of the [P.Q.A. Board] as it relates to persons providing certain emergency medical services and transferring that authority to the Emergency Medical Services Board" of MIEMSS. 1997 Md. Laws 1912, 1912.