935 A.2d 719

M. Louis OFFEN

v.

Alan I. BRENNER.

Misc. No. 1, Sept. Term, 2007.

Court of Appeals of Maryland.

Nov. 14, 2007.

Edward M. Buxbaum (Emily A Daneker, Whiteford, Taylor & Preston, L.L.P., Baltimore, on brief), for appellant.

Tarra DeShields-Minnis, Asst. U.S. Atty. (Rod. J. Rosenstein, U.S. Atty., on brief), for appellee.

Argued before BELL, C.J., RAKER, HARRELL, BATTAGLIA, GREENE, ALAN M. WILNER (Retired, specially assigned) and DALE R. CATHELL (Retired, specially assigned), JJ.

RAKER, J.

Pursuant to the Maryland Uniform Certification of Questions of Law Act, Md.Code (1974, 2006 Repl.Vol.), §§ 12–601 to 12–609 of the Courts and Judicial Proceedings Article, the United States Court of Appeals for the Fourth Circuit has certified the following question of Maryland law:

> "[I]n deciding whether a statement that led to an administrative proceeding against a public employee is protected by absolute privilege, should the duties and authority of the employee against whom the statement was made be considered in determining 'the nature of the public function of the proceeding'?"

Our answer to the Fourth Circuit's question shall be a qualified yes; the duties and authority of the employee are a useful factor, but should not be determinative, in considering the nature of the public function of the administrative proceeding.

## I.

We recite the facts as set out in the Certification Order.

"The plaintiff (and appellant in this certification procedure), M. Louis Offen, M.D., is an employee with the U.S. Department of Health and Human Services (DHHS), working in the Division of Vaccine Injury Compensation (DVIC). Offen is a neurologist who reviews claims filed against the DHHS by persons seeking compensation for alleged vaccine-related injury. Offen evaluates the merits of a claim and transmits his conclusions to the Department of Justice

(DOJ) lawyer assigned to represent the DHHS on the claim. The DOJ has the authority to determine how to proceed with a claim. Offen has no authority in that regard.

"In 2004 Offen reviewed a Hepatitis B vaccine injury claim and reported his conclusions to the assigned DOJ lawyer. The DOJ lawyer then contacted Offen's supervisor, Vito Caserta, M.D., for further assistance in evaluating the claim. Caserta, in turn, discussed the claim with two other physicians, the defendant, Alan I. Brenner, M.D., a rheumatologist who is an outside consultant for DVIC, and Arnold Gale, M.D. In May 2004 Offen forwarded certain materials related to the claim to Brenner for his review. Later, on July 30, 2004, Brenner sent a letter to Offen's supervisor, Caserta, which contained the following passages:

"In the past several months I have had a number of telephone calls and E mail communications from Dr. Offen, each requesting my private opinion on DVIC cases not officially assigned to me for consultation. . . .

"The first of this latter type of call was regarding the makeup of our Civilian Expert Immunization Committee (CEIC). The substance of that call was to question me about the process of selection of committee members. I felt that the tone of the questions was accusatory and, in my opinion, defamatory and degrading to DVIC. . . .

"You will recall that, several months ago, you arranged a telephone conference in which you, Dr. Arnold Gale and I participated. The purpose of that conference was to discuss [the Hepatitis B claim]. . . .

"About 2 months ago Dr. Offen called me, stating that the case had not been presented in its entirety and that you had misrepresented the facts to induce Dr. Gale and me. . . . My recollection of the call was that Dr. Offen accused you of twisting the facts and of leaving out pertinent information to suit some personal purpose and that he wanted to send me the case record suggesting that my review of the documents would prove that our conclusion was in error.

"I have been very disturbed by the tone of Dr. Offen's accusations and the way in which he has seemed to try to enlist my support in some sort of personal vendetta against DVIC in general and several members of the office in particular. Indeed I believe that Dr. Offen has had something derogatory to say about each and every medical officer involved. Dr. Offen has also made it quite clear that he has no respect for the leadership of DVIC. He positively gloated over Thom Balbier's transfer, telling me that Thom had been removed for incompetence and stating that you would be the next to go. J.A. 6–7.

"This letter prompted Caserta to initiate formal DHHS disciplinary proceedings against Offen, who was suspended for five days without pay and stripped of some of his responsibilities. The administrative proceedings against Offen were conducted according to the procedures set forth in the agency's regulations, and he does not contend that the procedural safeguards were inadequate."

## II.

Dr. Offen filed a complaint, in the United States District Court for the District of Maryland, alleging defamation. Dr. Brenner filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, failure to state a claim upon which relief may be granted. Following a hearing, the district court dismissed the complaint in favor of the defendant based on absolute immunity. Dr. Offen appealed to the United States Court of Appeals for the Fourth Circuit. He contends that the district court erred in refusing to consider his limited duties and authority when the court analyzed the nature of the public function of the proceeding. The Court of Appeals for the Fourth Circuit certified the question of law to this Court.

The question before us arises from the application of factors set forth by this Court in *Gersh v. Ambrose*, 291 Md. 188, 434 A.2d 547 (1981). In that case, a staff member of the Baltimore City Community Relations Commission filed a defama-

tion suit for statements made by an assistant state's attorney at a quasi-legislative public hearing. This Court found the defense of absolute immunity did not apply, but noted as follows: "[W]e have decided that whether absolute witness immunity will be extended to any administrative proceeding will have to be decided on a case-by-case basis and will in large part turn on two factors: (1) the nature of the public function of the proceeding and (2) the adequacy of procedural safeguards." *Id.* at 197, 434 A.2d at 551–52. Although we have ruled on the interpretation of the second factor of the *Gersh* test—the adequacy of procedural safeguards—in several cases, we have not yet had cause to examine the first factor in such detail, that of the nature of the public function of the proceeding.

### III.

Before this Court, Dr. Offen argues, first, that no significant public interest is implicated to justify the application of absolute immunity under the first prong of the *Gersh* test. He contends the district court erred when it relied on an overly generalized public interest. The district court said "the important public function of administrative disciplinary procedures is to have an orderly system of personnel, dedicated and competent employees, and that's especially important in the area of health." Dr. Offen argues his behavior would not be of significant public concern and that the district court's identification of an orderly system of personnel is not a socially important concern that rises to the level of a vital public interest.[1]

Second, Dr. Offen maintains that the district court erred when it failed to consider the defamed employee's duties and authorities in its analysis under the first *Gersh* factor. Ac-

---

1. The question of whether the public interest identified by the district court, "to have an orderly system of personnel," is sufficiently compelling to warrant an absolute privilege is not before this Court. We answer only the certified question of whether an employee's duties and authority should be taken into consideration when examining the nature of the public function of the proceeding.

cording to Dr. Offen, the application of "the nature of the public function of the proceeding" depends upon a factual inquiry into the employee's duties and powers. He relies on *Miner v. Novotny*, 304 Md. 164, 498 A.2d 269 (1985), *Imperial v. Drapeau*, 351 Md. 38, 716 A.2d 244 (1998), and *Reichardt v. Flynn*, 374 Md. 361, 823 A.2d 566 (2003), to support his conclusion, contending that when statements *precede* the initiation of an administrative proceeding, each of those cases make necessary an evaluation of the essential public interest of a particular category of employee. Failing to consider the duties and authority of an employee, according to Dr. Offen, creates a per se application of absolute privilege, allowing generalized public interests to sufficiently support the first *Gersh* factor.

Dr. Brenner counters that the duties, responsibilities and authority of an employee should not be dispositive as to whether a privilege applies. He rejects the contention that the justification for extending absolute immunity changes depending on whether an administrative hearing is pending at the time of the defamation or whether instead the statement serves to initiate a subsequent proceeding. He contends that the first *Gersh* factor has been applied the same way regardless of this temporal difference, with the purpose of ensuring that the nature of the proceeding factors into the public policy reason for extending the privilege. Dr. Brenner argues that adopting an approach where the first prong turns on an inquiry into the rank of the defamed employee would deter legitimate complaints against low-level employees for fear of retaliation.

## IV.

Under Maryland law, to present a prima facie case of defamation, a plaintiff must establish four elements: (1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm. *Smith v. Danielczyk*, 400 Md. 98, 115, 928 A.2d 795, 805 (2007). A defamatory state-

ment is one "which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person." *Gohari v. Darvish*, 363 Md. 42, 55, 767 A.2d 321, 327 (2001) (quoting *Rosenberg v. Helinski*, 328 Md. 664, 675, 616 A.2d 866, 871 (1992)). Depending upon the circumstances, a defendant in a defamation suit may assert a conditional or an absolute privilege.[2] *Danielczyk*, 400 Md. at 116–17, 928 A.2d at 806. *See generally* DAN B. DOBBS, THE LAW OF TORTS, §§ 413–414 (2000).

 An absolute privilege provides complete immunity from suit. The grant of absolute privilege was first applied in Maryland to witnesses in judicial proceedings in *Hunckel v. Voneiff*, 69 Md. 179, 14 A. 500 (1888). We have articulated the longstanding public policy behind the privilege as follows:

> "[I]t is of the greatest importance to the administration of justice that witnesses should go upon the stand with their minds absolutely free from apprehension that they may subject themselves to an action of slander for what they may say while giving their testimony. . . . 'The witness speaks . . . under the control of the court; is compelled to speak, with no right to decide what is immaterial; and he should not be subject to the possibility of an action for his words.' "

*Id.* at 187–88, 14 A. at 501 (internal citation omitted). Based on this justification, we provided absolute privilege for statements made by a witness in the course of judicial proceedings. *Reichardt v. Flynn*, 374 Md. at 366–67, 823 A.2d at 569

---

**2.** A conditional privilege protects a person from liability where the statement was published in good faith "in furtherance of his own legitimate interests, or those shared in common with the recipient or third parties, or where his declaration would be of interest to the public in general." *Gohari v. Darvish*, 363 Md. 42, 56, 767 A.2d 321, 328 (2001) (internal quotation omitted). An absolute privilege differs from a conditional privilege because "the former provides immunity regardless of the purpose or motive of the defendant, or the reasonableness of his conduct, while the latter is conditioned upon the absence of malice and is forfeited if it is abused." *Kennedy v. Cannon*, 229 Md. 92, 97, 182 A.2d 54, 57 (1962).

(quoting *Hunckel,* 69 Md. at 193, 14 A. at 504); *Bartlett v. Christhilf,* 69 Md. 219, 223–27, 14 A. 518, 519–20 (1888). The privilege applies even when the witness publishing the defamatory statement does so maliciously, despite known falsity, or under otherwise unreasonable conduct. *Reichardt,* 374 Md. at 367, 823 A.2d at 569; *Schaub v. O'Ferrall,* 116 Md. 131, 138, 81 A. 789, 792 (1911). Maryland follows the minority English rule, where the privilege applies irrespective of the statement's relevance to the proceeding. *Reichardt,* 374 Md. at 367, 823 A.2d at 569; *Korb v. Kowaleviocz,* 285 Md. 699, 703–04, 402 A.2d 897, 898–99 (1979); *Schaub,* 116 Md. at 138–39, 81 A. at 792.

We have upheld the application of absolute privilege for statements by witnesses in the courtroom during the course of a trial. *Korb,* 285 Md. at 704, 402 A.2d at 899; *Maulsby v. Reifsnider,* 69 Md. 143, 164, 14 A. 505, 511 (1888). Absolute privilege applies also to statements "contained in pleadings, affidavits or other documents directly related to the case." *Keys v. Chrysler Credit Corp.,* 303 Md. 397, 403–04, 494 A.2d 200, 203 (1985) (applying absolute immunity to the issuance of a writ garnishing wages post-judgment); *Di Blasio v. Kolodner,* 233 Md. 512, 197 A.2d 245 (1964) (finding stricken allegations are protected by the privilege); *Bartlett,* 69 Md. at 227, 14 A. at 520 (holding privileged a petition alleging contempt of court in an ongoing proceeding). The privilege extends also to statements that serve to initiate a judicial proceeding. *See, e.g., Kerpelman v. Bricker,* 23 Md. App. 628, 630, 329 A.2d 423, 425 (1974). In 1980, this Court extended the privilege to statements prepared for possible use in an action, but not actually introduced as part of the proceeding. *Adams v. Peck,* 288 Md. 1, 415 A.2d 292 (1980). One year later, the Court addressed whether absolute privilege could apply in administrative proceedings in *Gersh v. Ambrose,* 291 Md. 188, 434 A.2d 547 (1981).

In *Gersh,* an assistant state's attorney made allegedly defamatory remarks about a member of the city's community relations commission at a public hearing before that commission. While declining to apply the privilege in the particular

case because of the lack of formal procedure attendant to the open hearing and an insufficiently compelling public interest, we nevertheless recognized that the absolute privilege afforded judicial proceedings *could* extend to adjudicatory hearings before administrative bodies. *Id.* at 193, 434 A.2d at 549–50. We noted that when administrative proceedings' framework and protections are functionally comparable to judicial processes, immunity could be safely extended to cover such proceedings. *Id.* at 192–93, 434 A.2d at 549–50. Importantly, the Court chose not to limit the test for whether to apply the privilege to only the existence of adequate procedural safeguards. Instead, we provided that the analysis should examine such procedural safeguards in conjunction with the nature of the public function of the proceeding:

> "[W]e have decided that whether absolute witness immunity will be extended to any administrative proceeding will have to be decided on a case-by-case basis and will in large part turn on two factors: (1) the nature of the public function of the proceeding and (2) the adequacy of procedural safeguards which will minimize the occurrence of defamatory statements."

*Id.* at 197, 434 A.2d at 551–52. The Court declined to apply the doctrine of privilege because the safeguards were insufficient and because the public interest was not sufficient to outweigh potential harm to the individual, reasoning as follows:

> "In the instant case *the public interest sought to be advanced* is far less compelling. . . . Moreover, we find nothing in the record before us to indicate the presence of conditioning devices or safeguards . . . which are present in judicial proceedings. . . . *The public benefit to be derived* from testimony at Commission hearings of this type is not sufficiently compelling to outweigh the possible damage to individual reputations to warrant absolute witness immunity."

*Id.* at 196, 434 A.2d at 551 (emphasis added). The test, since its establishment in *Gersh,* has been applied by this Court in five cases.

*In Miner v. Novotny,* 304 Md. 164, 498 A.2d 269 (1985), this Court applied absolute immunity to citizen complaints of police brutality that led to an administrative hearing. After determining there were sufficient procedural safeguards under the second factor of *Gersh,* we noted as follows:

"Our society vests its law-enforcement officers with formidable power, the abuse of which is often extremely detrimental to the public interest. Citizen complaints of such abuses, and the administrative disciplinary procedure which has been developed to investigate these complaints, serve a public function of vital importance by providing a mechanism through which abuses may be reported to the proper authorities, and the abusers held accountable.

"The viability of a democratic government requires that the channels of communication between citizens and their public officials remain open and unimpeded. Were complaints such as Novotny's not absolutely privileged, the possibility of incurring the costs and inconvenience associated with defending a defamation suit might well deter a citizen with a legitimate grievance from filing a complaint. We therefore conclude that the possible harm a false brutality complaint may cause to a law-enforcement officer's reputation, despite the procedural safeguards provided by the LEOBR, is outweighed by the public's interest in encouraging the filing and investigation of valid complaints."

*Id.* at 176, 498 A.2d at 274–75. The "inhibition of citizens' criticisms of those entrusted with their protection" was a "far worse evil" than the harm that "a false accusation of brutality may have on a law-enforcement officer." *Id.* at 177, 498 A.2d at 275.

Next, in *McDermott v. Hughley,* 317 Md. 12, 561 A.2d 1038 (1989), we reaffirmed the basis for extending absolute immunity, to prevent unduly hindering important speech, and to ensure that "otherwise actionable conduct thus is protected where the accused acts in furtherance of a recognized socially important interest." *Id.* at 23, 561 A.2d at 1044. We noted that McDermott "assert[ed] the importance to the public of having mental health care professionals render unfettered

diagnoses particularly where a police officer is involved." *Id.* at 25, 561 A.2d at 1045. Nevertheless, we declined to extend the privilege to a psychologist who issued a requested report evaluating the fitness of an officer in the police department's horse-mounted patrol unit because of the absence of procedural safeguards in the proceeding.[3]

In *Odyniec v. Schneider*, 322 Md. 520, 588 A.2d 786 (1991), a patient underwent a required physical examination during the investigation of her pending medical malpractice claim before the Health Claims Arbitration Office. The examining doctor, who was expected to later present his expert testimony before the arbitration panel, told the patient during his assessment that her previous doctor had performed unnecessary medical procedures on her. The treating doctor filed a complaint alleging defamation, and this Court held that absolute immunity barred suit. Where the statement was made by a witness in connection with a legislatively-mandated arbitration process, we found that both prongs of the *Gersh* test had been met. The policy extending immunity under *Gersh* applied, "[t]aking full account of the vital public function of health care malpractice proceedings initiated before arbitration panels" as well as the procedural safeguards established by the claims arbitration process. *Id.* at 534, 588 A.2d at 792–93. We said further: "The social benefit derived from free and candid participation by potential witnesses in the arbitration process

---

**3.** While both Dr. Offen and Dr. Brenner argue that *McDermott* supports their respective positions on *Gersh*'s first factor, we did not reach an evaluation of the importance of the nature of the public function identified in the case. Our holding instead was that immunity did not apply because procedural safeguards, as required under *Gersh*'s second factor, were lacking. We do note, however, the striking similarity of the cases factually, because like in *McDermott*, Dr. Offen is accused of having no respect for his supervisor and harboring a personal vendetta against certain employees. The psychologist's allegedly defamatory report in *McDermott* contended that the defamed employee referred to his supervisor as a "Nazi," complained about management style, and was refusing to cooperate because "he did not like the Unit or the Unit commander." *Id.* at 19–20, 561 A.2d at 1042. In the present case, Dr. Brenner's letter asserted that Dr. Offen had a personal vendetta against the department, made derogatory remarks about its members, and did not respect its leadership.

is essential to achieve the goal of a fair and just resolution of claims of malpractice against health care providers," stressing "the societal value of maintaining the integrity of the process itself." *Id.* at 534–35, 588 A.2d at 793.

We addressed the defense of absolute privilege in administrative proceedings again in *Imperial v. Drapeau*, 351 Md. 38, 716 A.2d 244 (1998). The question in that case was whether an EMT could maintain a suit for defamation where a doctor, acting as a private citizen, alleged the EMT's incompetence in letters to the Governor and a member of Congress. This Court upheld the application of an absolute privilege. Citing "the importance to the public that all medical participants in the emergency medical system be competent," the Court said as follows:

"Because the quality of pre-hospital, emergency medical care can literally be a matter of life and death, it carries a very high priority. Accordingly, public policy encourages the communication of information to public authorities responsible for maintaining the quality of emergency medical services."

*Id.* at 50, 716 A.2d at 250–51.

Finally, this Court, in *Reichardt v. Flynn*, 374 Md. 361, 823 A.2d 566 (2003), applied the privilege to bar suit regarding defamatory statements made by parents and their children to public school authorities alleging sexual misconduct on the part of Flynn, a high school teacher and coach. We found that both prongs of *Gersh* were satisfied. As to the first prong, we quoted the language of the Court of Special Appeals finding that the first *Gersh* prong was met:

"[T]here is really nothing more important to the core of the well-being of our community, our State and our nation than the public school system. It is unquestionably an issue of strong public interest that students and parents should be protected from suit for reporting a teacher's alleged sexual misconduct."

*Id.* at 373, 823 A.2d at 573 (internal quotation omitted). The second prong of *Gersh* was the primary focus on appeal. The

Court of Special Appeals had found an absolute privilege did not apply because Flynn lacked a right to appeal his suspension by the Superintendent, and even if he had aright to appeal, the procedural safeguards of the proceeding were inadequate because the alleged defamation had preceded the hearing and any safeguards therein. We disagreed and reversed, finding that Flynn was entitled to appeal his suspension to the Montgomery County Board of Education and subsequently to the State Board of Education. We also noted that the availability of procedural safeguards only after an initial adverse action satisfied the second factor of *Gersh,* since "[t]his same situation ... is going to exist in every case in which a complaint is made about government personnel, and the complaint initiates an administrative proceeding." *Id.* at 376, 823 A.2d at 575.

With this background in mind, we turn to the specific certified question from the United States Court of Appeals for the Fourth Circuit.

## V.

The Fourth Circuit Court of Appeals asks us to clarify how to apply the first *Gersh* factor when an allegedly defamatory statement is made prior to the institution of administrative proceedings. *See Gohari v. Darvish,* 363 Md. at 74, 767 A.2d at 338 (noting that in defamation cases, "the existence of [a] privilege ... is a question of law for the court.").

The fact that we have not thus far had cause to base a denial of privilege on the insufficient public nature of the proceeding should not lead to the mistaken conclusion that the first *Gersh* factor is subject to only a cursory inquiry. We made clear in *Gersh* that any extension of absolute privilege "will turn in large part on two factors," setting forth the importance of a dual inquiry into both the nature of the public function of the proceeding and the adequacy of procedural safeguards. *Gersh,* 291 Md. at 197, 434 A.2d at 551–52. This Court has consistently examined both factors to determine whether a privilege exists. *See, supra,* Part IV. The public

policy underpinnings of *Gersh* support the idea that quasi-judicial processes alone are insufficient justification for privilege. We held the existence of privilege depended on procedural safeguards and "the nature of the question into which it is [the tribunal's] duty to inquire." *Gersh,* 291 Md. at 196, 434 A.2d at 551 (quoting *Trapp v. Mackie,* 1 All E.R. 489, 492 (1979), 1 W.L.R. 377 (H.L.1978)).

In keeping with the policy reasons for extending the privilege, this Court said in *Odyniec,* and repeated in *Imperial:*

"*Gersh, Miner,* and *McDermott* thus stand for the proposition that absolute witness immunity will not be extended to a nonjudicial proceeding unless the same policy considerations which underlie application of the privilege in the judicial sphere are also present. It must appear from the *nature and conduct* of the proceeding that society's benefit from unfettered speech during the proceeding is greater than the interests of an individual who might be defamed during that proceeding."

*Odyniec,* 322 Md. at 531, 588 A.2d at 791 (emphasis added); *Imperial,* 351 Md. at 48, 716 A.2d at 249. The overarching purpose of the first *Gersh* factor in considering the nature of the proceeding's public function is to require more than procedural safeguards for an extension of privilege to nonjudicial settings. Without the first factor, the mere existence of quasi-judicial processes could protect every defamatory statement that leads to a proceeding from becoming actionable. Such a result would lead to a per se immunity for administrative proceedings. It would collapse the inquiry into the nature of the *public function* of the proceeding into simple reliance on the nature of administrative proceedings in and of themselves.

Dr. Brenner argues that the quote from *Odyniec,* calling for "the same policy considerations" for the extension of the privilege in both judicial and administrative proceedings, supports his contention that the justification for applying privilege must be the same, regardless of whether an administrative proceeding is pending or not yet initiated at the time of the defamatory statement. The phrase "same policy consider-

ation," however, refers to the policy interest in favor of fostering freedom of expression, even at the cost of individual reputation. This justification occurs only when both the nature and conduct of the proceeding raise it to the level that implicates favoring free speech over potential harm. We have held that the sufficiency of procedural safeguards does not vary depending upon whether the defamation occurs during or instead initiates an administrative proceeding. *See Reichardt,* 374 Md. at 376–77, 823 A.2d at 575. It does not follow, however, that nature of the public function will be the same, regardless of temporal difference.

In *McDermott* we said that "otherwise actionable conduct thus is protected where the accused acts in furtherance of a recognized socially important interest." *McDermott,* 317 Md. at 23, 561 A.2d at 1044. It follows that when the nature of the public function of the proceeding is that it acts to protect a socially important interest, absolute immunity should apply. In the context of ongoing judicial or quasi-judicial administrative proceedings, we have recognized the socially important interest that "it is of the greatest importance to the administration of justice that witnesses should go upon the stand with their minds absolutely free from apprehension that they may subject themselves to an action of slander for what they may say while giving their testimony." *Hunckel,* 69 Md. at 187, 14 A. at 501. We have relied on a similar justification for the extension of privilege in cases of ongoing administrative proceedings. *Odyniec,* 322 Md. at 534, 588 A.2d at 792 (noting the vital public function of "the arbitration machinery established by the legislature for health care malpractice claims" encouraged the extension of privilege to the witnesses before arbitration panels).

In evaluating "the nature of the public function of the proceeding" when administrative proceedings have not yet been initiated at the time the defamatory statement is published, we have found justification for the privilege in *Miner, Imperial,* and *Reichardt.* Each of those cases emphasized the socially important interest in allowing for the protestation and

reporting of alleged abuses of the public trust as a result of official conduct. This Court laid out the importance of this public interest in *Miner*, noting that citizen complaints of police brutality abuses "serve a public function of vital importance by providing a mechanism through which abuses may be reported to the proper authorities, and the abusers held accountable. The viability of a democratic government requires that the channels of communication between citizens and their public officials remain open and unimpeded." *Miner*, 304 Md. at 176, 498 A.2d at 275. The importance of not deterring citizen complaints outweighed the possible harm of defamatory statements.

Similarly, in *Reichardt*, the complained-of abuse affected the public school system, which the Court called "the core of the well-being of our community, our state and our nation." *Reichardt*, 374 Md. at 373, 823 A.2d at 573. We expressed a similar public function as the one we found in *Miner*, stating "[i]t is unquestionably an issue of strong public interest that students and parents should be protected from suit for reporting a teacher's alleged sexual misconduct." *Id.* Finally, in *Imperial*, this Court noted the life and death situations entrusted to emergency medical technicians to emphasize how the competence of such workers critically affects the public at large. Again our focus was on allowing the unhindered reporting of complaints, as we observed that "public policy encourages the communication of information to public authorities responsible for maintaining the quality of emergency medical services." *Imperial*, 351 Md. at 50, 716 A.2d at 250.

By identifying the socially important interest of avoiding abuses upon the public welfare, this Court emphasized the public function of the eventual proceeding. The phrase "the nature of the public function" implies a further inquiry into the nexus between the socially important interest (the public function) and the proceeding. It requires an examination of an identified public interest, and how it is advanced by the proceeding. This Court has found that in cases where a citizen questions official conduct and protests the abuses of public officers, the nature of the public function to protect the

public from such abuse is served well by an administrative proceeding. A nexus exists between the proceeding's function and a legitimate public interest, such as avoiding abuses upon the public.[4]

 Examining "the nature of the public function of the proceeding" sheds light on the proceeding's effect on the public and its impact on a socially important interest. It therefore may be necessary in some cases to examine the public authority or duties entrusted in the employee. The duties and authority attendant to a particular position may determine how much influence an official has over the public from his or her position, which in turn can affect how closely the proceeding serves a public interest. From our jurisprudence, it follows that the "nature of the public function of the proceeding" therefore also includes an inquiry into a person's power over the public when the identified public interest is an important check on that power.

In *Miner*, the connection between the public interest in protecting society from the abuse of power and the duty and authority of the police officer was self-evident. We said "[o]ur society vests its law-enforcement officers with formidable power, the abuse of which is often extremely detrimental to the public interest." *Miner*, 304 Md. at 176, 498 A.2d at 274–75. In *Reichardt* we stated "[i]f 'public school teacher' were substituted for 'law-enforcement officer,' the above-quoted passage would be fully applicable in the case at bar." *Reichardt*, 374 Md. at 371, 823 A.2d at 572. Both cases dealt with the yielding of considerable authority and power over the public trust. Extending absolute privilege in *Miner* was preferable to "the inhibition of citizens' criticisms of those entrusted with their protection," directly implicating the duty law enforcement officers have to protect the public at large. *Miner*, 304 Md. at 177, 498 A.2d at 275. The same duties of

---

4. *Miner, Imperial* and *Reichardt* have all identified a significant public interest that protects against abuses upon the public by certain officials. We do not suggest that this is the only justification that might suffice under the first *Gersh* factor in future cases.

trust and protection were implicated in *Reichardt* when the Court said: "It is unquestionably an issue of strong public interest that students and parents should be protected from suit for reporting a teacher's alleged sexual misconduct." *Reichardt*, 374 Md. at 373, 823 A.2d at 573. And in *Imperial* we said, "the importance to the public that all medical participants in the emergency medical system be competent is self-evident," focusing on the particular category of employee and the public's interest in its duty and authority. *Imperial*, 351 Md. at 50, 716 A.2d at 250. In each of these cases, the Court considered the employee's duty and authority in evaluating the nature of the public function served by prospective administrative proceedings.

By contrast, Dr. Offen contends that he has no authority or power over the public. He characterizes himself as a low-level employee making only recommendations on claims, which the Department of Justice (DOJ) then has the power to adopt or not. Dr. Brenner argues that this characterization is disingenuous and that Dr. Offen's position of expertise and the importance of handling vaccination claims effectively results in a system that defers to the recommendations provided by personnel such as Dr. Offen and relies on their credibility. Dr. Brenner's rebuttal highlights the importance of determining how Dr. Offen's duties relate to the important interest identified by the trial court. We would not separate Dr. Offen's duties and responsibility from an evaluation of the nature of the public function of the proceeding in this case.

In keeping with our reasoning that "the nature and scope of such proceedings are too varied to be circumscribed by specific criteria," *Gersh*, 291 Md. at 197, 434 A.2d at 551, the inquiry into the duty and authority of a defamed employee is not determinative. As we have indicated, whether a privilege will apply is to be determined on a case-by-case basis. *Id.* In *McDermott*, we listed several procedural failures in holding the investigation did not meet *Gersh*'s second factor. This Court stated that it was not "implying either that the above is a complete listing of factors or that each of the factors listed is always required." *McDermott*, 317 Md. at 26, 561 A.2d at

1045. The same can be said of our holding here under the first *Gersh* factor.

Accordingly, under Maryland defamation law, the duties and authority of the employee against whom a statement was made should be considered, but are not dispositive, in determining the nature of the public function of an administrative proceeding when deciding whether a statement that led to that proceeding against an employee is protected by absolute privilege.

*CERTIFIED QUESTIONS OF LAW ANSWERED AS SET FORTH ABOVE. COSTS TO BE EQUALLY DIVIDED BY THE PARTIES.*